Benjamin J. HARRIS, III, by and through Judith H. RAMSEYER, Guardian ad litem, Petitioner,

v.

James BLODGETT, Superintendent Washington State Penitentiary, Respondent.

No. C89–307TB.

United States District Court, W.D. Washington, at Tacoma.

May 17, 1994.

Allen M. Ressler, Browne & Ressler, Seattle, WA, for petitioner.

Katrin E. Frank, MacDonald, Hoague & Bayless, Seattle, WA, guardian ad litem for petitioner.

John M. Jones and Paul D. Weisser, Washington State Atty. General's Office, Olympia, WA, for respondent.

**AMENDED**[*] DECISION, INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW; and ORDER GRANTING WRIT OF HABEAS CORPUS

BRYAN, District Judge.

## INDEX TO DECISION

Introduction ................................................................. 1247
Factual and Procedural Background ........................................... 1248
Issues Presented ............................................................ 1251
Standard of Review .......................................................... 1252
Discussion of Issues ........................................................ 1253
ISSUE [1]1.　　　　Whether Harris received effective assistance of counsel before trial, during trial, and on post conviction proceedings, including appeal　1253
　　　　　　The Standard for Effective Assistance of Counsel ............... 1253
　　1. Deficiency of Performance ................................. 1254
　　2. Prejudice to Defense .................................... 1254
Ground A.　Counsel did not conduct a thorough investigation of facts surrounding the charge and possible defenses ........... 1255
Ground B.　Counsel failed to adequately prepare for trial ............. 1255
Ground C.　Counsel failed to adequately consult with his client and to inform him on important issues and decisions regarding his defense ........................................... 1258
Ground D.　Counsel failed to investigate Harris's mental and emotional status, including mental capacity and incompetence to stand trial ........................................... 1259

---

[*] Only Issues 6a and 11 are amended.

1. Issues are numbered according to the *Petition for Habeas Corpus*. Issues 10, 12, 13, 14, and 15 were previously dismissed.

Ground E. Counsel failed to challenge admissibility of Harris's Statements .......................................... 1261

Ground F. Counsel failed to properly protect Harris's rights when the October 22, 1984 statement was made and admitted at trial, and during Harris's testimony during the guilt phase ... 1261

Ground G. Counsel should have attempted to mitigate with prosecutor before the prosecutor decided to seek the death penalty 1264

Ground H. Counsel failed to conduct proper voir dire ................ 1264

Ground I. Counsel failed to object to inadmissible evidence .......... 1265

Ground J. Counsel failed to develop a viable defense strategy........ 1265

Ground K. Counsel failed to propose, or except to, jury instructions .. 1266

Ground L. Counsel failed to object to improper comments by prosecutor during closing arguments in penalty phase ............. 1267

Ground M. Counsel's closing argument in the guilt phase was deficient 1267

Ground N. Counsel failed to present available evidence during penalty phase................................................. 1268

Ground O. Counsel failed to raise or preserve meritorious issues in appellate proceedings ................................ 1271

Ground P. Counsel failed to advise Harris of a conflict of interest.... 1271

ISSUE NO. 2. Whether the admission of prior convictions in 1969 for manslaughter and assault during the penalty phase violated petitioner's right to due process ......................................... 1274

ISSUE NO. 3. Whether Washington's capital punishment statute is unconstitutional because it allows consideration of an unconstitutionally obtained prior conviction during the penalty phase .................... 1277

ISSUE NO. 4. Whether petitioner's incompetency prevented a fair trial........ 1278

ISSUE NO. 5. Whether the state failed to disclose exculpatory evidence ........ 1280

ISSUE NO. 6. Whether Harris's constitutional rights were violated when his pre-trial statement of October 22, 1984 was made and admitted at trial 1281

ISSUE NO. 6a. Whether Harris properly waived his Fifth Amendment right to remain silent..................................................... 1282

ISSUE NO. 7. Whether Harris's Fifth Amendment right against self incrimination was violated by the admission, at trial, of statements made by Harris to police during the investigation ..................... 1283

ISSUE NO. 8. Whether the prosecutor's decision to seek the death penalty denied Harris due process, equal protection, and was cruel and unusual punishment ............................................. 1284

ISSUE NO. 9. Whether, during closing arguments in the penalty phase, the prosecutor committed error by attempting to minimize the jury's sense of responsibility for punishment ............................. 1285

ISSUE NO. 11. Whether the Washington State Supreme Court performed an inadequate proportionality review, thereby violating petitioner's due process rights......................................... 1286

ISSUE NO. 16. Whether there is any constitutional infirmity resulting from the disparity of Harris's death sentence and his co-defendant's acquittal ...................................................... 1291

ISSUE NO. 17. Whether the inconsistent verdicts are unconstitutional .......... 1292

ISSUE NO. 18. Whether Jury Instructions No. 2 and 5, given during the penalty phase, erroneously encouraged the jury to reach a unanimous verdict on all issues ...................................... 1292

ISSUE NO. 19. Whether death by hanging is unconstitutional as cruel and unusual punishment .............................................. 1293

ISSUE NO. 20. Whether the requirement that petitioner choose between methods of execution is unconstitutional as cruel and unusual punishment 1293

CONCLUSION ..................................................... 1293

LEGEND

I. STATE COURT RECORD

 Vol.\_\_\_\_ ............................................. "Volume"

 CP \_\_\_\_ ......................................... "Clerk's Papers"

 VRP \_\_\_\_ ............................... "Verbatim Report of Proceedings"

 Plaintiff's Ex. \_\_\_\_ ................................ "State Trial Exhibits"

II. U.S. DISTRICT COURT RECORD

Evid.TR_____ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . "Testimony of Murray Anderson"
Parkhurst Evid.TR_____ . . . . . . . . . . . . . . . . . . . . . . . . "Testimony of Sgt. Parkhurst"
Stip. Facts No. _____ . . . . . . . . . . . . . . . . . . . . . "Stipulation of Facts, Appendix A."
Cease Dep. _____ . . . . . . . . . . . . . . . . . . . . . . . . . . "Deposition of Richard Cease"
Haist Dep. _____ . . . . . . . . . . . . . . . . . . . . . . . . . . "Deposition of Thomas Haist"

THIS MATTER comes before the court on Benjamin A. Harris's Petition for Writ of *Habeas Corpus.* The court has considered all pleadings filed in support of and in response to the petition, the evidence adduced at an evidentiary hearing held on Monday, December 20, 1993, including the depositions of Thomas Haist, Richard Cease, John Petrich, M.D. and Allen W. Traywick, Ph.D. The court heard oral arguments of counsel at that hearing and at prior hearings on motions. The court also considered the state court record filed herein, Volumes 1 to 12, trial exhibits, and the U.S. District Court file. The parties entered into a Stipulation of Facts with accompanying documents, filed on October 25, 1993, which is fully incorporated herein by this reference. The Stipulation is attached hereto as Appendix A.

## INTRODUCTION

This is not a search for legal technicalities. It is not a search for justification to take, or save, a life. It is not a case about the legal, moral, or social implications of the death penalty. It is not a review of a state case for simple legal error. Neither the question of Harris's guilt nor the advisability of a death sentence will be reexamined here.

This is a review of a state proceeding to determine if federal constitutional requirements were met, and to determine the affect of any constitutional violations on the state proceedings. It is appropriate, under the law, to undertake this procedural review for any person who has lost freedom as a result of a criminal conviction in any court in the United States. Even if petitioner is guilty in fact, and even if he should be put to death, American law says that such a conviction and sentence will not stand unless, and until, the conviction and sentence are determined to be in accord with the U.S. Constitution.

The writ of *habeas corpus* was first written into English law in 1679, although it existed informally before that time. *See Wright,*

*Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d,* Sec. 4261 at 271 (citations omitted). The writ may be sought in any situation where an individual challenges another's authority to restrain his or her liberty. Commonly referred to as "The Great Writ," it has been declared "both the symbol and guardian of individual liberty." *Peyton v. Rowe,* 391 U.S. 54, 58, 88 S.Ct. 1549, 1551, 20 L.Ed.2d 426 (1968) (citations omitted).

■ Modern federal procedure for a writ of *habeas corpus* is codified in 28 U.S.C. Sec. 2241, *et seq.* As a result of its development in American law, the writ has three primary characteristics: First, it is largely used to provide post-conviction relief. Second, it requires *"prompt* adjudication of the validity of the challenged restraint." *Peyton,* 391 U.S. at 59, 88 S.Ct. at 1552 (citations omitted). Third, the federal courts are authorized to look behind the state court record, and may conduct a fact finding hearing to determine the merits of alleged constitutional violations. *Id.* (citations omitted).

Legal scholars have long debated the merits of a procedure whereby a federal court can examine into a state court system's adjudication of an individual's crimes and sentence:

Support for broad federal habeas review stems from our devotion to individual justice, the symbolic value of the writ as the hallmark of democracy under law, the safety-valve effect of providing an additional forum for testing constitutional claims as well as a belief that the federal judiciary is often in the best position to further these interests. Arguments against broad application of the writ include its tendency to foster inefficient, repetitive judicial consideration of the same issue. The writ's interference with finality in the criminal process together with the lack of comity inherent in federal district court review of the

decisions of a state supreme court also weigh against widespread application of the writ.

*Allen, Schachtman & Wilson, Federal Habeas Corpus and Its Reform: An Empirical Analysis,* 13 Rutgers L.J. 675, 678 (1982). This court does not intend to continue the debate, or to comment on the worthiness of either position.

When a person's life may be taken, an exacting constitutional scrutiny is required. The U.S. Supreme Court has demanded that the review "aspire to a heightened standard of reliability.... This especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different." *Ford v. Wainwright,* 477 U.S. 399, 411, 106 S.Ct. 2595, 2602, 91 L.Ed.2d 335 (1986).

Constitutional provisions at issue in this case include the accused's right to have the effective assistance of counsel for his defense (Sixth Amendment); the accused's right to refuse to be a witness against himself (Fifth Amendment); the accused's right to a fair trial and to due process of law (Fifth and Fourteenth Amendment); the accused's right to equal protection of the laws (Fourteenth Amendment); and the accused's right to be free from the infliction of cruel and unusual punishment (Eighth Amendment).

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Trial Court History

This statement summarizes the historical facts and events in this case to the present. It is not intended to be an exhaustive statement of all significant facts but sets the stage for more detailed fact-finding and discussion.

In the early morning hours of June 14, 1984, the body of Jimmie Lee Turner was found outside 2134 South Hosmer, Tacoma, Pierce County, Washington. Vol. 3, CP 978. An information filed on July 27, 1984 charged Gregory Lee Bonds with aggravated murder in the first degree. Vol. 3, CP 979. Benjamin Harris was arrested as a material witness on July 30, 1984. Vol. 3, CP 984, 989. He was released on his personal recognizance after administrative booking and was ordered to make daily contact with Tacoma Police Officers Antonson or Parkhurst. Vol. 3, CP 989. Harris was taken to the Calico Cat Motel by Tacoma Police officers for security. Vol. 3, RP 30. Harris took two polygraph examinations given by agents of the Tacoma Police Department, on August 7, 1984 and on August 8, 1984. Vol. 2, VRP 31. Harris was arrested immediately following the second polygraph examination. Vol. 1, VRP 32.

On August 10, 1984 Benjamin Harris appeared in court and an amended information was filed, charging Harris and Bonds with aggravated murder in the first degree. Vol 1, CP 1013–14. Counsel was appointed to represent Harris on August 13, 1984. Vol. 3, CP 1018. On August 16, 1984, the Prosecuting Attorney filed a Notice of Special Sentencing Proceeding to Determine Whether the Death Penalty Should be Imposed on Harris. Vol. 3, CP 1019. The Prosecuting Attorney noted in this document that "Presentation of mitigating circumstances is the responsibility of the defendant. *See State v. Bartholomew,* 101 Wash.2d 631, 643, 683 P.2d 1079 (1984). No mitigating circumstances have been brought to the attention of this office." Vol. 3, CP 1020. A duplicate, but separate, notice was also filed for Bonds. Trial for both defendants was set for September 24, 1984.

On August 28, 1984, counsel for Bonds filed a motion for severance. Vol. 3, CP 1042–49. Harris joined in that motion. Vol. 3, CP 1058–60. At the same time, the state filed a motion to set aside a trial continuance that had been obtained by counsel for Bonds. (The trial date for Bonds had been continued to November 12, 1984.) On September 26, 1984, the trial court denied the state's motion to set aside Bonds' continuance and granted the defendants' motion for severance. Vol. 3, CP 1125–27. Harris's trial was continued to October 15, 1984. Vol. 3, CP 1083.

A hearing was held on September 20, 1984 pursuant to Washington Superior Court Criminal Rule 3.5 (commonly referred to as a "CrR 3.5 hearing"). The hearing was to determine the admissibility of oral statements made by Harris before his arrest, and

statements in letters he sent to Sgt. Parkhurst of the Tacoma Police Department after his arrest. The court orally ruled that all statements, oral and written, which were the subject of the hearing, were voluntary and admissible at trial. Vol. 3, CP 1088. Formal findings of fact and conclusions of law were entered on October 18, 1984, four days before trial. Vol. 3, CP 1169–73. Therein, trial court formally ruled that all statements made by Harris were freely and voluntarily made, that when the investigation focused on Harris, he was properly advised of his *Miranda* rights, and that all letters sent by Harris to Sgt. Parkhurst before and after his arrest were voluntary and unsolicited by Parkhurst. The court further ruled that all statements and letters were admissible at trial. Vol. 3, CP 1173.

On September 28, 1984, Harris's counsel filed a motion for a mental examination of Harris, with a supporting affidavit and memorandum of authorities. U.S.D.C., Ex. 1; Vol. 3, CP 1133–41. Counsel's affidavit detailed extensive difficulties in communicating with Harris, and significant concern regarding his ability to assist in his defense. The motion was granted. Vol. 3, CP 1145–46. The court appointed qualified members of the staff of Western State Hospital to examine and diagnose Harris's mental condition and to report to the court as specified in RCW 10.77.060. The report was to contain an opinion as to Harris's capacity to understand the proceedings against him and to assist in his defense, whether he perceived the moral qualities of the acts with which he was charged, and whether further examination and testing was required. *Id.* This was not an independent defense examination. Harris was transferred to Western State Hospital for the examination.

On October 8, 1984, Harris was returned to the Pierce County Jail and the results of examining team at Western State Hospital were disclosed. Vol. 3, CP 1158–59. A letter opinion was filed in the trial record and stated that the defendant was competent to stand trial, was able to assist in his defense, was aware of the charges against him, was able to perceive the nature and quality of his act at the time of the alleged offense, and did not require future testing or evaluation. Vol. 3, CP 1159. The opinion did not address diminished capacity, general mental and emotional status, nor other matters that could have assisted counsel in defending a capital case. Counsel learned after the guilt phase but before the penalty phase that some of the testing done was not scored and was not included in the opinion. Vol. 3, CP 1196–98.

On October 11, 1984, Harris's counsel filed a motion for continuance of the trial and for examination of the defendant by his own expert. Vol. 3, CP 1162–63. On October 17, 1984, an order was entered granting a trial continuance from October 15, 1984, to October 22, 1984. In the order, the court found that Harris's counsel was engaged in another ongoing criminal trial and that the defendant desired to be evaluated by an expert of his own choosing. Vol. 3, CP 1167–68. The court record does not reflect any further order regarding evaluation of Harris by his own expert. The issue of funding was not raised by defense counsel. Harris was not examined by the independent expert before trial.

On the morning of October 22, 1984, the day set for trial, Harris, at the suggestion and recommendation of counsel, met with prosecuting attorneys and police officers. Evid.TR 20–21. Harris was accompanied by his counsel, and gave a recorded, detailed statement of his version of the events, including an admission that he fired one of the two fatal shots at Turner. Vol. 1, VRP 69–92; Plaintiff's Trial Ex. 14. Trial began in the afternoon of October 22, 1984 and continued to the morning of October 26, 1984. A verdict of guilty to the charge of aggravated murder in the first degree was entered by the jury in the afternoon of the same day. Vol. 3, CP 1178. The penalty phase was scheduled to begin on the morning of October 31, 1984.

The penalty phase was held on October 31, 1984, lasting from 9:40 a.m. to 11:02 a.m. Vol. 3, CP 1195. The jury returned with its verdict, finding "no sufficient mitigating circumstances to merit leniency" in the afternoon of the same day. Vol. 3, CP 1190, 1195. Sentencing was set for November 5, 1984.

Harris filed a motion in arrest of judgment or, in the alternative, for a new trial on November 5, 1984. Vol. 3, CP 1196–98. Sentencing was continued to November 19, 1984. Vol. 3, CP 1199. The motion for a new trial focused on the fact that, because certain diagnostic data was not scored by the evaluators at Western State Hospital, Harris's mental examination was incomplete. The defendant argued that this data may have contained relevant information on Harris's competency to stand trial and on mitigating factors regarding his mental state when the crime was committed. Vol. 3, CP 1196–98. The deposition of Dr. Kathleen Mayers was ordered and the hearing on the motion was set over to December 10, 1984. Vol. 4, CP 1507. An order was entered requiring the defendant to make an offer of proof regarding evidence of a mental disturbance before the December 10th hearing. The order also granted defendant's request to authorize Dr. Allen W. Traywick and Dr. Mayers access to the Pierce County Jail for further testing and evaluation of Harris. Vol. 4, CP 1517–18.

On November 13, 1984, Bonds' trial began, starting with pretrial motions. Vol. 4, CP 1533. On November 26, 1984, Harris testified for the state. The record does not reflect that any accommodations were offered to Harris in exchange for his testimony. The jury returned a verdict of not guilty on December 6, 1984. Vol. 4, CP 1564–65.

The hearing on Harris's motion for a new trial was again continued to December 26, 1984, due to scheduling conflicts. Vol. 4, CP 1571–72. The hearing was then again set over to January 9, 1985, to allow preparation of the deposition transcript of Dr. Traywick. Vol. 4, CP 1576. After hearing, the motion was denied and formal Findings of Fact and Conclusions of Law were entered on January 21, 1985. Vol. 4, CP 1662–67. The court found that the defendant had the opportunity to obtain his own psychological expert to evaluate his mental condition before trial and failed to do so. The court further found that the testimony of Ray Meeks was the essentially the same in both the Harris and the Bonds trials, and the acquittal of Bonds had no relevance to the Harris case. *Id.* Judg-

ment and Sentence of death was entered on January 14, 1985. Vol. 4, CP 1578–80. The trial judge, as required by RCW 10.95.120, completed and filed the "Report of the Trial Judge" on January 15, 1985. Vol. 4, CP 1648–60.

## B. Appellate History

A Notice of Appeal to the Washington Supreme Court was filed on February 11, 1985. Vol. 4, CP 1670. Trial counsel was appointed for the appeal. Vol. 4, CP 1679. In a published opinion, *State v. Harris,* 106 Wash.2d 784, 725 P.2d 975 (1986), the Washington Supreme Court affirmed the conviction and the death sentence. The opinion included the mandatory death sentence review required by RCW 10.95.100. 106 Wash.2d at 789, 797–99, 725 P.2d 975. The first death warrant was entered on December 15, 1986. Vol. 5, CP 1917. New counsel was appointed for Harris on February 23, 1987. Vol. 6, CP 2264. A petition for writ of *certiorari* was filed in the U.S. Supreme Court Vol. 6, CP 2267–2304 and was denied by that court on March 23, 1987. Vol. 6, CP 2305.

Harris filed his first state personal restraint petition in the Washington Supreme Court on September 7, 1987, raising numerous issues. Vol. 7, CP 2332–2690. His petition was denied in *In re Harris,* 111 Wash.2d 691, 763 P.2d 823 (1988). Vol. 8, CP 3022–49. Harris filed a second state personal restraint petition on December 2, 1988, attacking the constitutional validity of his guilty plea to the 1969 manslaughter charge. On December 8, 1988, counsel for Harris filed a motion to stay further proceedings pending determination of competency and for appointment of a mental health professional to examine Harris. Vol. 8, CP 3069–76. The Washington Supreme Court issued an order on March 8, 1989, *inter alia,* denying the motion for stay, authorizing the appointment of a mental health professional, and denying the second personal restraint petition without prejudice. Vol. 8, CP 3089–90.

A second petition for writ of *certiorari* was filed in the U.S. Supreme Court and was denied on May 15, 1989. Vol. 8, CP 3098. Harris refiled his second state personal re-

straint petition [third petition in chronological order], raising the identical issues, on May 19, 1989. Vol. 11, CP 3996–4008. The Washington Supreme Court denied the petition with prejudice on May 10, 1990. Vol. 11, CP 4024–25. Petitioner's motion for reconsideration was denied by the court on June 7, 1990. Vol. 11, CP 4103–04.

On May 30, 1989, a hearing was held in the trial court to set a date for execution, and to determine if Harris was competent to be executed. Vol. 9, VRP 3151–3233. Harris presented evidence and argument that he was not competent to be executed. At the conclusion of the hearing, the court found the defendant competent to be executed and an execution date was set for July 11, 1989. Vol. 9, VRP 3231–32. The death warrant was entered on May 30, 1989. Vol. 9, CP 3287. Notice of appeal to the Washington Supreme Court was filed on June 2, 1989. Vol. 9, CP 3286. On June 15, 1989, oral argument was heard by the trial court on Harris's motion to vacate the order setting execution date. Vol. 9, CP 3234–83. The motion was denied at the conclusion of the hearing. Vol. 9, CP 3282.

Harris filed a motion for stay of execution pending appeal/personal restraint petition and petition for discretionary review on June 20, 1989. Vol. 9, CP 3295–3374. On June 30, 1989, the Washington Supreme Court granted the petition for discretionary review and set the matter for oral argument on September 26, 1989. Vol. 9, CP 3439–41. Along with the appeal, counsel for Harris filed a third state personal restraint petition [fourth petition in chronological order] to the Washington Supreme Court on July 24, 1989. Vol. 10, CP 3446–3521. This petition attacked the validity of the competency hearing held in the trial court on May 30, 1989. The Supreme Court denied the petition and appeal in a published opinion, *State v. Harris*, 114 Wash.2d 419, 789 P.2d 60 (1990). Vol. 10, CP 3953–92.

Harris filed a fourth state personal restraint petition [fifth petition in chronological order], raising an issue of improper jury instructions in the sentencing phase, pursuant to *Mak v. Blodgett*, 970 F.2d 614 (9th Cir.1992). Vol. 12, CP 4105–35. In an un-published order, the Washington Supreme Court denied that petition on March 16, 1993, as an abuse of the writ. Vol. 12, CP 4180–84. On March 16, 1993, petitioner's state remedies were thoroughly exhausted.

### C. Federal Court History

On June 13, 1989, Harris filed a petition for writ of *habeas corpus,* a motion for stay of execution, and other administrative motions in United States District Court for the Western District of Washington. The matter was assigned to the undersigned judge. Oral argument on the motion for stay of execution was heard on June 22, 1989. The court orally granted the motion for stay. A written order of stay was entered on July 6, 1989, delaying further federal proceedings until final resolution of the third state personal restraint petition/appeal pending before the Washington Supreme Court.

In July, 1990, the court was advised by Harris's counsel that he was concerned that Harris could not understand, and assist with, the federal habeas corpus proceedings because of his mental condition. After consideration of memoranda from both parties on the issue of competency, the court granted petitioner's motion for appointment of an expert and ordered an evidentiary hearing. The hearing was held on September 20, 1990. Findings of Fact and Conclusions of Law were entered on November 21, 1990, determining that Harris was not competent to litigate his *habeas* petition without assistance. A Guardian ad Litem was appointed for Harris.

These proceedings were again stayed on August 24, 1992 to allow the Washington Supreme Court the opportunity to consider petitioner's fourth state personal restraint petition. Proceedings in this court resumed following the final exhaustion of Harris's state remedies by the decision of the Washington Supreme Court on March 16, 1993.

### ISSUES PRESENTED

Harris's petition for *habeas corpus* presents the following issues:

1. Whether Harris received effective assistance of counsel before trial, during trial,

and on post conviction proceedings, including appeal.

2. Whether the admission of Harris's 1969 convictions for manslaughter and assault during the penalty phase violated his constitutional right to due process.

3. Whether Washington's capital punishment statute is unconstitutionally defective because it allows consideration of an unconstitutionally obtained prior conviction during the penalty phase.

4. Whether Harris's incompetency prevented a fair trial.

5. Whether the state failed to disclose exculpatory evidence to defense counsel.

6. Whether Harris's constitutional rights were violated when his pretrial statement of October 22, 1984 was made, and when it was admitted at trial.

6a. Whether Harris properly waived his Fifth Amendment protection against self incrimination during the guilt phase.

7. Whether Harris's Fifth Amendment right against self incrimination was violated by the admission, during the guilt phase, of statements made by Harris to police during the investigation.

8. Whether the state's decision to seek the death penalty denied Harris due process and equal protection, and constituted cruel and unusual punishment.

9. Whether, during closing arguments in the guilt phase, the prosecutor committed error by attempting to minimize the jury's sense of responsibility for Harris's punishment.

11. Whether the Washington Supreme Court performed an inadequate proportionality review, thereby violating Harris's due process rights.

16. Whether there is any constitutional infirmity resulting from the disparity of Harris's death sentence and his co-defendant's acquittal.

17. Whether the inconsistent verdicts are unconstitutional.

18. Whether Jury Instructions No. 2 and 5, given during the penalty phase, erroneously encouraged the jury to reach a unanimous verdict on all issues.

19. Whether death by hanging is unconstitutional as cruel and unusual punishment.

20. Whether the requirement that Harris choose between methods of execution is unconstitutional as cruel and unusual punishment.

## STANDARD OF REVIEW

### General Standard for Federal Review of State Court Proceedings

Habeas corpus relief is available to "persons whom society has grievously wronged and for whom belated liberation is little enough compensation." *Fay v. Noia*, 372 U.S. 391, 441, 83 S.Ct. 822, 850, 9 L.Ed.2d 837 (1963). For petitioners, such as Harris, who are in custody pursuant to a state court judgment of conviction, a writ of habeas corpus may be granted by a federal court if the petitioner can show "he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. Sec. 2254(a). The court is directed to "dispose of the matter as law and justice require." 28 U.S.C. Sec. 2243.

A petitioner is entitled to habeas relief if unconstitutional trial error is found to have "had substantial and injurious effect or influence in determining the jury's verdict ... and resulted in 'actual prejudice'." *Brecht v. Abrahamson*, ⎯ U.S. ⎯, 113 S.Ct. 1710, 1712, 123 L.Ed.2d 353, 373 (quoting *United States v. Lane*, 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986)). Other unconstitutional errors are found "in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards." "The existence of such defects—deprivation of the right to counsel, for example—requires automatic reversal because they infect the entire trial process." *Brecht, Id.* at 367, 113 S.Ct. at 1717 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)).

Before coming to federal court, the petitioner is required to exhaust all remedies available in the state courts by raising all issues which support his contention that he is in custody illegally. 28 U.S.C. Sec. 2254(b)

and (c). Harris has exhausted his state remedies on all issues. In fact, this proceeding has been much delayed while he did so.

Findings of fact, made by either the state trial court or state appellate court after a full, fair, and adequate hearing, are presumed to be correct and are binding on the federal court. 28 U.S.C. Sec. 2254(d). *Sumner v. Mata*, 449 U.S. 539, 546, 101 S.Ct. 764, 768–69, 66 L.Ed.2d 722 (1981). Factual findings may be determined in federal court, or may be set aside in federal court, in certain circumstances enumerated in 28 U.S.C. Sec. 2254(d). Several of those circumstances are applicable in this case. In pertinent part, the statute states as follows:

(1) that the merits of the factual dispute were not resolved in the State court hearing;

(2) that the fact finding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

. . . . .

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concluded that such factual determination is not fairly supported by the record: ...

The burden falls on the petitioner to show by convincing evidence that any factual determinations made by the state court are erroneous. 28 U.S.C. Sec. 2254.

■■■ The statutory presumption of correctness does not apply to purely legal questions or mixed questions of law and fact. *Chaney v. Lewis*, 801 F.2d 1191, 1194 (9th Cir.1986) (citations omitted); *Sumner v. Mata*, 455 U.S. 591, 597, 102 S.Ct. 1303, 1306–07, 71 L.Ed.2d 480 (1982) (and citations in n. 9). Legal questions and mixed questions of law and fact, including the determination of the legal and/or constitutional effect of factual findings, are entitled to a complete and independent *de novo* review. *Chaney v. Lewis*, 801 F.2d at 1194–95 (and cases cited therein); *Sumner v. Mata*, 455 U.S. at 597, 102 S.Ct. at 1306–07. "In deciding this question [mixed questions of law and fact], the federal court may give different weight to the facts as found by the state court and may reach a different conclusion in light of the legal standard." *Sumner v. Mata, id. See also Reiger v. Christensen*, 789 F.2d 1425 (9th Cir.1986). An example of a mixed question of law and fact is the determination of effective assistance of counsel, a major question presented in this case. *Reiger v. Christensen*, 789 F.2d at 1428; *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

## DISCUSSION OF ISSUES

*ISSUE NO. 1. Whether Harris received effective assistance of counsel before trial, during trial, and on post conviction proceedings, including appeal.*

■■■ In his first issue, Harris claims that his counsel's trial and appellate performance amounted to a denial of his Sixth Amendment right to effective assistance of counsel. He has claimed many deficiencies. They are discussed individually herein as Grounds A–P, following an overview of the standard of review.

### The Standard for Effective Assistance of Counsel

The right to effective assistance of counsel is found in the Sixth Amendment to the U.S. Constitution. The Sixth Amendment states: "In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." This right was comprehensively discussed in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

In the *Strickland* case, the U.S. Supreme Court observed that the right to counsel is crucial to a fair trial because "access to counsel's skill and knowledge is necessary to accord defendants the ample opportunity to meet the case of the prosecution." 466 U.S. at 685, 104 S.Ct. at 2063 (citations omitted). Any claim of ineffective assistance must be judged against this benchmark: "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland* at 686, 104 S.Ct. at 2064. The court established a two part test to make this determination; to be successful the defendant must sustain his burden of proof on both parts.

> First, the defendant must show that counsel's performance was deficient. This required showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This required showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable.

466 U.S. at 687, 104 S.Ct. at 2064.

### 1. Deficiency of Performance

To succeed on the first part of the test, referred to as "deficiency of performance" (*Mak v. Blodgett*, 970 F.2d 614, 618 (9th Cir.1993)), the defendant must show that "counsel's representation fell below an objective standard of reasonableness ... considering all the circumstances ... under prevailing professional norms." *Strickland*, 466 U.S. at 687–88, 104 S.Ct. at 2064–65; *Mak, id.*

A reviewing court "must be highly deferential" to counsel's performance; make "every effort ... to eliminate the distorting effects of hindsight," and must maintain "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance ... and might be considered sound trial strategy." *Strickland, id.* at 689, 104 S.Ct. at 2065.

### 2. Prejudice to Defense

To succeed on the second part of the test, referred to as the "prejudice to defense" (*Mak*, 970 F.2d at 619), the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. Reasonable probability is defined as "a probability sufficient to undermine confidence in the outcome." *Id.*

A reviewing court must evaluate "the totality of the evidence before the judge or jury". *Id.* at 695, 104 S.Ct. at 2069. In a capital case, the reviewing court must apply this balancing test:

> When a defendant challenges a death sentence ... the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

*Id.; Mak*, 970 F.2d at 619–20.

An objective standard of attorney performance, under prevailing professional norms at the time of this case, can be found in the ABA Standards for Criminal Justice, 2nd ed. (1980). (A third edition was published in 1992 and is not significantly different from the second edition.) The American Bar Association's ("ABA") project to establish "desirable or acceptable" standards of practice for criminal justice began in 1963. The overall goal is "to represent a just balance between the goals of effective administration of criminal justice and proper regard for the constitutional rights of the accused and society." Introduction, at xxix. These standards are regularly used by courts as guidelines in determining whether an attorney's performance falls below reasonable professional standards. *See Strickland*, 466 U.S. at 688, 104 S.Ct. at 2064–65; *United States v. Blaylock*, 20 F.3d 1458 (9th Cir.1994); *Jeffries v. Blodgett*, 988 F.2d 923, 940 (9th Cir. 1993).

The ABA's description of the role of defense counsel is instructive.

The basic duty the lawyer for the accused owes to the administration of justice is to serve as the accused's counselor and advocate with courage, devotion, and to the utmost of his or her learning and ability and according to law.

ABA Standard 4–1.1(b). In the commentary, it is stated, "[o]nce a case has been undertaken, a lawyer is obliged not to omit any essential honorable step in the defense, without regard to compensation or the nature of the appointment." *Id.* at 4.8.

The record reflects that no findings of fact have been made by any state court regarding Harris's claims of ineffective assistance of counsel. Pursuant to 28 U.S.C. Sec. 2254(d)(1), this court is not bound by a presumption of factual correctness, may consider the evidence, and make factual determinations. Therefore, this discussion of Issue No. 1 contains extensive findings of fact. Fed. R.Civ.P. 52(a).

The court has grouped two of Harris's grounds for his claim of ineffective assistance of counsel into one for ease of discussion. Several general principles apply to Grounds A and B.

**Ground A. Counsel did not conduct a thorough investigation of facts surrounding the charge and possible defenses.**

**Ground B. Counsel failed to adequately prepare for trial.**

Harris argues that his counsel did not conduct an adequate or thorough investigation of the facts surrounding the charge against him, including possible defenses. Petitioner contends that counsel did not conduct an independent investigation of the events before, during or after the murder. Petitioner alleges that counsel did not obtain an investigator to discover mitigating facts, an independent ballistics expert to examine the bullets and victim's wounds, or an expert for a social history evaluation. Harris contends that, as a result of this inadequate trial preparation, counsel had no theory of defense, that he was unprepared for effective cross examination, filed inadequate pretrial mo-

tions, and was deficient in conducting both the guilt and penalty phases of the trial.

The state generally disputes petitioner's allegations, and argues that Harris is simply unable to prove them to be true. The state argues that because counsel had known Harris for many years, he was well acquainted with his social and mental history. The state points to various inconsistent statements by Harris himself which complicated counsel's task in determining a clear trial strategy, other than a general denial. The state concludes that Harris fails to show that he was prejudiced or that the result in the case would have been different if counsel had done more hands-on investigation.

■ The duty to investigate is part of a defendant's right to reasonably competent counsel. "The principle is so fundamental that the failure to conduct a reasonable pretrial investigation may in itself amount to ineffective assistance of counsel." *United States v. Tucker,* 716 F.2d 576, 583 n. 16 (9th Cir.1983) (citing *McQueen v. Swenson,* 498 F.2d 207, 217–18 (8th Cir.1974)). The ABA states the duty as follows:

> It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty.

ABA Standard 4–4.1. The investigatory process should begin immediately on appearance as counsel for a defendant. ABA Standard 4–3.2(a) states:

> As soon as practicable the lawyer should seek to determine all relevant facts known to the accused. In so doing, the lawyer should probe for all legally relevant information without seeking to influence the direction of the client's responses.

The commentary to this standard states:

> An adequate defense cannot be framed if the lawyer does not know what is likely to

develop at trial ... In criminal litigation, as in other matters, information is the key guide to decisions and action. The lawyer who is ignorant of the facts of the case cannot serve the client effectively.

P. 4.33.

■ The duty to investigate is not eliminated by the client's own conclusions or admissions of guilt, because the client's beliefs may not coincide with the necessary elements of proof to establish guilt in law. The client may not be aware of the significance of facts regarding intent, mitigation, suppression of evidence, or impeachment of witnesses that only an independent investigation can uncover. *See* ABA Standard 4–4.1, Commentary at 4.54.

■ This obligation cannot be short cut because of counsel's professional experience or his prior personal experience with the defendant. Counsel's experience and knowledge are not admissible evidence. "The most able and competent lawyer in the world can not render effective assistance in the defense of his client if his lack of preparation for trial results in his failure to learn of readily available facts which might have afforded his client a legitimate justiciable defense." *McQueen v. Swenson,* 498 F.2d 207, 217 (8th Cir.1974) (citations omitted). *See also United States v. Tucker, supra.* "The effectiveness of advocacy is not to be measured solely by what the lawyer does at the trial; without careful preparation, the lawyer cannot fulfill the advocate's role." Commentary to ABA Standard 4–4.1.

■ The parties have stipulated to several key facts pertaining to these issues: Stip. Facts No. 11 verifies that counsel did not obtain an expert to prepare a social history. Stip. Facts No. 12 verifies that counsel did not retain an investigator to interview witnesses. Stip. Facts No. 69 states that the police reports provided to counsel contained the names of 32 individuals with knowledge of the events pertaining to the murder. Nineteen of these individuals testified at the guilt phase. Stip. Facts No. 70 states that counsel interviewed only 3 of those individuals before trial: Ray Meeks, Valerie Stevens, and Annie Sue Bayless.

Counsel did not obtain an independent evaluation of the ballistic evidence or the forensic evidence in the case. Such an investigation may have led to information useful in creating a defense to the charges, especially since two individuals were charged with the murder. Sgt. Parkhurst, the investigating police officer, did not believe that two individuals shot Turner, because of the locations of the bullet entries on Turner's body. Stip. Facts No. 84. Since the first shot was lethal, Sgt. Parkhurst believed that Turner would have fallen immediately, thereby making it impossible for Bonds to pass the gun to Harris to take a second shot. Stip. Facts No. 85, Parkhurst Evid.TR at 6–7. This information was contained in the police reports and autopsy, which were provided to counsel but was not elicited at trial. Stip. Facts Nos. 82 and 83. The need for an independent fact investigation was critical because Harris was the person who initiated police contact, provided evidence to the police, such as the bullets from the gun used to kill Turner, and kept up that contact until he caused them to turn their investigatory attention to him. Stip. Facts Nos. 29, 31, 32, and 33. Such an investigation was even more critical because Harris gave different versions of the murder at different times. Some of the most inculpatory versions may have been subject to attack, as stated above and in Grounds D, E, F, G, and N, *infra.*

In addition to those individuals named in the police reports, Stip. Facts Nos. 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, and 81 describe various available individuals who had knowledge of events pertaining to the murder, or of Harris's social and mental history. None of these individuals were interviewed by counsel and none of the information they had, either for defense at the guilt phase, or mitigation at the penalty phase, was presented by the defense. Counsel made the decision not to interview individuals whose names were provided to associate counsel by Harris. Haist Dep. at 11–12. Counsel did meet with Sgt. Parkhurst on two occasions before the CrR 3.5 hearing. Evid.TR at 13. Counsel, however, did not conduct the CrR 3.5 hearing on behalf of Harris. Associate counsel rep-

resented Harris at that hearing. *See* Ground F, *infra*.

Counsel's failure to interview witnesses deprived him of the opportunity of making

> an informed assessment of the strengths and weaknesses of the government's case without attempting to ascertain specifically what the testimony of the government's witnesses would be. In general, [counsel's] ability to cross-examine the government's witnesses effectively was seriously compromised by his failure to interview them, since he would have little idea as to the specific areas of testimony which could be challenged.

*United States v. Tucker*, 716 F.2d at 883. Counsel's lack of knowledge about the testimony of witnesses is seen throughout the trial. *See, e.g.*, Vol. 1, VRP 247–48; Vol. 1, VRP 402 (no cross examination of medical examiner re ballistic evidence); Vol. 1, VRP 468–69; 475–78; 486 (no discovery of Meeks' deals with prosecutor for his testimony); Vol. 2, 617–18 (no knowledge of Sylvia Harris's testimony).

Because of his poor preparation, counsel did not appear to fully understand the implications of Harris's 22 October 1994 statement that he fired the second shot at Turner. Based on forensic evidence, police believed that Turner was killed by only one man. Parkhurst Evid.TR at 6–7; Stip. Facts No. 85 and Ex. G to Stip. Facts. Counsel testified that his trial strategy changed after hearing this statement. He testified that he was surprised with Harris's new version of the events and he was essentially left without a theory of defense. There was no reason to allow Harris to make this statement as part of a reasonable defense strategy and to have suggested or allowed it was not competent. Cease Dep. at 41–42. *See* Grounds C and F, *infra*.

One means of evaluating counsel's performance in this case is to compare the activities of counsel for the co-defendant, Bonds. For example, the record reflects that a series of written pretrial motions were filed in the Bonds case. These were: Motion for Examination Pursuant to RCW 10.77.060(1) (Vol. 3, CP 1122–24); Motion to Sever Defendants for Purposes of Trial (joined by Harris after its filing) (Vol. 3, CP 1042–49); Motion for Change of Venue, or in the Alternative for Individual Voir Dire (Vol. 3, CP 1216–18); Motion re Unconstitutionality of RCW 10.95.060(4) (Vol. 3, CP 1224–30); Motion to Quash Jury Panel (Vol. 3, CP 1272–76); Motion re Excusing for Cause a Juror Who is Opposed to Capital Punishment on Religious Grounds (Vol. 4, CP 1389–1411); Motion for Dismissal for Improper Prosecutorial Discretion and Violations of Due Process and Equal Protection (Vol. 3, CP 1202–06); Motion to Dismiss Based Upon the Unconstitutionality of RCW 10.95.040 and RCW 10.95.060(4) "as applied" (Vol. 4, CP 1412–21); Motion re Admissibility of Video Tape [Bonds' counsel prepared a video tape, reenacting the murder] (Vol. 3, CP 1208–15); Motion to Dismiss [for Violation of 5th Amendment] (Vol. 3, CP 1231–45); Motion re Unconstitutionality of RCW 2.36.010 (Vol. 3, CP 1219–23); Motion for Order Allowing Copy of Benjamin Harris Testimony (Vol. 3, CP 1207); and various motions *in limine* (*see* Order at Vol. 4, CP 1499). Harris's counsel filed three written pretrial motions: Motion for Mental Examination (Vol. 3, CP 1138–41); Motion for Continuance of Trial Date and for Examination of Defendant by Defendant's Own Expert (Vol. 3, CP 1162–63); and Request for CrR 3.5 Hearing (*see* order at Vol. 3, CP 1072).

Another example is to compare the time representations of Harris's counsel with those of counsel for Bonds. Since both individuals were charged with the same offense, the cases were based on the same evidence. In an unrelated affidavit, Bonds's counsel stated:

> Finally, presentation of the penalty phase requires massive preparation by defense counsel. Such is not humanly possible at the same time as preparing for defense of the guilt phase. Some of the most basic and fundamental issues of life are required to be aired and argued to their fullest. Your affiant, while working literally seven days a week on this matter, has not had sufficient time to marshall that testimony, nor consider the appropriate strategies and arguments to present to the jury.

Vol. 3, CP 1281. A review of Harris's counsel's time sheet indicates that he spent a total

of only approximately 14 hours investigating and interviewing witnesses. Ex. J to Stip. Facts.

It is inconceivable to this court that so little time was spent in pretrial investigation and preparation for a capital murder case. Counsel's investigation and preparation for trial fell below the objective standard of reasonableness and amounted to a deficient performance. There is a reasonable probability that, but for this deficiency, the result of the guilt and penalty phases would have been different, that is, the deficiency undermines confidence in the outcome.

### Ground C. Counsel failed to adequately consult with his client and to fully inform him on important issues and decisions regarding his defense.

■ Harris argues that his counsel failed to spend enough time with him discussing pretrial motions, information learned from discovery, developments through investigation, trial strategy and tactics (including whether he would testify at trial), the overall defense theory, and the advantages and disadvantages of admitting to murder.

The state responds that Harris erroneously relies solely on counsel's billing statement, which is reflected in Stip. Facts No. 96 and Ex. J to Stip. Facts. That statement shows that counsel spent a total of one hour and 48 minutes consulting with Harris before the trial began. According to the state, this billing statement of the time spent by counsel on this case is inaccurate and does not reflect the true amount of time spent. The state contends that counsel routinely did not bill for his total time on a case.

The most fundamental element of competent representation of any client is the establishment of trust and confidential relationship. ABA Standard 4–3.1(a). This is especially true in criminal defense and is paramount in a capital case. Without this relationship, "the client may withhold essential information from the lawyer. Important evidence may not be obtained, valuable defenses neglected, and perhaps, most significant, the lawyer may not be forewarned of evidence that will be presented by the prosecution."

Commentary to ABA Standard 4–3.1. Even when a lawyer seeks input from the client on recommended strategic or tactical decisions affecting the client's rights, the client's reliance on counsel's expertise and full and careful advice is critical. *See* ABA Standard 4–5.2 and commentary.

■ The amount of client consultation required depends on the circumstances, charges, and facts of each individual case. At a minimum, "the consultation should be sufficient to determine all legally relevant information known to the defendant." *United States v. Tucker,* 716 F.2d at 882 n. 12 (citing The ABA Standards for Criminal Justice, Standard 4–3.2). An attorney should contact the defendant immediately and "spend quite a bit of time with the individual at that early stage." Cease Dep. at 14–15. Continual contact with the defendant thereafter is necessary to firmly establish a trusting relationship. *Id.* at 16. If defense counsel is faced with a client who does not follow his advice or has communication problems, the attorney should made a record, either in court or in his file, detailing the problem and his efforts to deal with the problem. Such a record is necessary 1) to protect the attorney from later attacks on his effectiveness and competency; 2) to assist the client; and 3) to notify the court that some curative action may be necessary to protect the client's rights. Cease Dep. at 31–32; ABA Standard 4–5.2(c) and commentary.

Stip. Facts No. 96 states that counsel billed for time with the defendant as follows: August 13, 12 minutes; October 11, 6 minutes; October 19, 90 minutes. Ex. J reflects additional time on August 8, 1984 of 1.4 hours and on August 9, 1984 of .8 hours. These latter two dates occurred after Harris's arrest but before his arraignment on the murder charge.

Counsel testified at the evidentiary hearing that it was difficult to talk to Harris while he was incarcerated because Harris believed the jail was bugged.

He didn't want to say a lot of things to me in the jail. We did have communication when we were in court. I would get the opportunity to talk to him before and after,

sometimes quite lengthy. He—Q. How lengthy? A. Oh, five minutes, perhaps ten minutes type thing as to what we were doing, where we were going.

Evid.TR at 14. Counsel recalled that he spoke with Harris on the telephone "maybe two or three, maybe as many as four or five" times. *Id.* at 15. Counsel made no effort to find another means of communicating with Harris in order to relieve Harris's paranoid fears. Such accommodations are highly recommended in ABA Standard 4–3.1.

Counsel was assisted by attorneys employed in his office, particularly one associate. Evid.TR at 6. Although there is no documentary information regarding the amount of time the associate spent with Harris, the associate testified that he met with Harris at the jail to review information he learned from the police reports, less than ten times, probably three or four times. Haist Dep. at 55. He stated that he was unable to accomplish that purpose because Harris did not rationally respond to his specific questions; that Harris would shift to irrelevant subjects. *Id.* at 9–10.

In spite of this limited contact, counsel made the decision on how the trial would proceed from the defense perspective. *Id.* at 30. This included the initial decision to place Harris on the witness stand, to which Harris was "resigned." *Id.* at 41. There was no lengthy witness preparation before placing Harris on the witness stand in the guilt phase. *Id.* at 37. In fact, the associate testified that counsel believed that Harris was incapable of testifying to anything, because of his inability to assist with his defense before trial. *Id.* at 38.

The court is aware that counsel may have spent more than the documented one hour and 48 minutes consulting with Harris after charges were filed. Rather than come forward with supplemental time records reflected additional hours of consultation, counsel explained that Harris had little substantial information to contribute to his defense. As is discussed in Ground D, *infra,* Harris's mental condition made meaningful consultation extremely difficult. If counsel had spent more personal time with Harris, he may have become convinced that Harris suffered from significant mental and/or emotional dysfunction, and may have acted differently. The court is also aware that the associate consulted with Harris, but counsel spent little time with the associate exchanging information gained from the associate's visits with Harris. Haist Dep. at 18–19, 21.

Counsel's failure to adequately consult with his client fell below the objective standard of reasonableness and amounted to a deficient performance. There is a reasonable probability that, but for this deficiency, the result of the guilt and penalty phases would have been different, that is, the deficiency undermines confidence in the outcome.

**Ground D. Counsel failed to Investigate Harris's mental and emotional status, including mental capacity and incompetence to stand trial.**

Harris argues that counsel did not interview numerous witnesses available to testify regarding his delusional mental state. Counsel did not seek or obtain medical and academic records which detailed his troubled childhood and youth, delusional thinking, and suicide attempts. As a result, Harris contends, the evaluating experts at Western State Hospital were not fully informed of his true history. Therefore, Harris argues, his counsel did not have accurate information to assess whether Harris was competent to stand trial or whether a defense of insanity or diminished capacity was appropriate.

The state argues that Harris is unable to prove that he fit the criteria for incompetency to stand trial, and that a defense based on insanity or diminished capacity would not have appropriate. The state finds no fault with counsel's decision to forego trial preparation on these issues.

Harris's legal expert opined that in an aggravated murder case, it is mandatory to hire a psychiatrist to assist counsel for several reasons: to advise on the propriety of placing the defendant on the witness stand; to assist with fact investigation and determination of what areas to pursue or not pursue; and to explain any bizarre behavior of the defendant. Cease Dep. at 20–25. These de-

ficiencies amounted to ineffective assistance of counsel. Cease Dep. at 29. While the court does not conclude that a defense psychiatrist is necessary in *every* aggravated murder case, certainly one was necessary in this case.

In the Harris case, there were two distinct purposes warranting an investigation of insanity, diminished capacity or incompetence: as a defense to the charges in the guilt phase, and as mitigating evidence in the penalty phase. Stip. Fact No. 14 indicates that counsel was aware of Harris's history of emotional problems and that counsel had similar communication problems with Harris during his representation in a criminal matter in May, 1968. Stip. Facts No. 50 verifies that counsel did not attempt to locate educational and medical records for Harris; Stip. Facts Nos. 51, 52, 53, 54, 55, 56, 57, 58, and 59 detail the types of records available from various sources, and their content. *See also* Exs. C and D to Stip. Facts. Counsel obtained an order allowing an independent psychological evaluation, but he failed to obtain an expert or to have Harris further evaluated until post trial proceedings.

Counsel testified that he did not consider insanity or diminished capacity as defenses "[b]ecause I had no evidence upon which to hang my hat that they could be reasonably successful, and I didn't believe them myself." Evid.TR at 19. Counsel stated that although he was somewhat aware of some of the strange stories being stated by Harris in his letters, he believed that Harris was "dissembling"; that is, attempting to convince others that he was mentally ill. *Id.* at 37–38. However, counsel filed a motion for Harris to be evaluated and, off the record, discussed the matter with the trial court, who sent Harris to Western State Hospital for evaluation. *Id.* at 38–40. Counsel stated that although he filed the affidavit detailing Harris's observable conduct, counsel believed that Harris was creating a false impression of his mental state. Counsel signed the affidavit supporting the motion for a mental examination, but personally did not believe in its contents. The affidavit was primarily the beliefs of associate counsel. *Id.* at 60–61. In the post trial proceedings, Dr. Traywick stat-

ed his professional belief that motive for Turner's murder (car tampering and debt) may have been a part of Harris's delusional system, which might have started as early as February or March 1984. Vol. 2, VRP 874–75.

Counsel erroneously substituted his personal judgment of Harris's competency and mental state for the expertise of mental health professionals. Because of his personal opinion of Harris, he failed to present to the evaluating team at Western State Hospital copies of letters which he, police and judges had received from Harris. Stip. Facts No. 56. These letters contained delusional beliefs and bizarre statements. As was seen in the development of the case, Harris's beliefs and statements were accepted as true because they were unchallenged and were used against him time and time again. Although Harris has the right to free speech, it was appropriate that his counsel determine if Harris's speech was based on truth or was the product of a mentally ill, or impaired, man.

The record is replete with evidence of Harris's mental dysfunction. Counsel failed to adequately explore the genesis and meaning of this dysfunction as part of a defense theory. The court cannot determine whether any valid defense based on insanity or diminished capacity existed, or whether Harris was incompetent to stand trial. However, the record reflects that Harris's mental instability was well documented, beginning in his childhood, and significantly affected his entire life. As a result, decisions and statements made by Harris had a questionable validity. If his mental condition had been properly and understood during the time the charges were pending, the entire course of defense may very likely have been different. For example, counsel may not have recommended Harris make the October 22, 1984 pretrial statement, or recommended that Harris take the witness stand at trial, and would certainly have presented evidence of mental and emotional dysfunctioning in the penalty phase.

Counsel's failure to investigate Harris's mental and emotional status fell below the objective standard of reasonableness and

amounted to a deficient performance. There is a reasonable probability that, but for this deficiency, the result of the guilt and penalty phases would have been different, that is, the deficiency undermines confidence in the outcome.

### Ground E. Counsel failed to challenge admissibility of Harris's statements.

■ Harris argues that counsel failed to challenge the admissibility at trial of his oral and written statements to police officers made before October 22, 1984, regarding the events of the murder.

The state contends that the admissibility of these statements had been adequately tested at the CrR 3.5 hearing and that the trial court correctly ruled that all statements could be admitted.

Harris does not specifically attack the validity of the trial court's ruling on the statements at issue in the CrR 3.5 hearing. Harris complains that counsel did not represent him at this critical step in the pretrial proceedings, leaving his interests in the hands of an inexperienced associate. The hearing transcript showed that many statements given by Harris at different times and in different ways were in issue. Some statements were oral, some written, some initiated solely by Harris, some given in response to police interrogation, and some given in response to polygraph examinations. It is not clear that counsel or the associate had copies of all of the statements or were fully informed of all of the circumstances in which each of the statements were made.

Without knowing the answers to these uncertainties, the court cannot pinpoint specific errors made during the hearing that may have resulted in a different ruling. Certainly, counsel's absence from this hearing deprived Harris of the full benefits expected of a CrR 3.5 hearing, including assessment of the demeanor of witnesses, testing various techniques of cross examination, exploring alternative trial strategies, and learning of all statements made and their circumstances.

Harris did not testify at the hearing and he was not advised by the trial court of his right to do so. The associate made that decision alone. Vol. 1, VRP 60.

Counsel's failure to challenge the admissibility of Harris's statements fell below the objective standard of reasonableness and amounted to a deficient performance. There is not, however, a reasonable probability that, but for this deficiency, the result of the guilt and penalty phases would have been different.

### Ground F. Counsel failed to properly protect Harris's rights when the October 22, 1984 statement was made and admitted at trial, and during Harris's testimony during the guilt phase.

■ Harris contends that counsel's advice convinced him to make a statement regarding his involvement in the events surrounding the murder with the possibility of negotiations leading to a reduction in the charge or in sentencing options. Harris argues that counsel did not know what he intended to say when he gave his statement. Harris contends that counsel did not set any specific ground rules with the prosecutor for evaluating the worth of statement before Harris began his statement. Harris believes that his counsel should have stopped him when it was apparent that Harris was making statements different than counsel expected. Harris argues that there was no tactical reason, based on the evidence in the case, for Harris to make the statement or to allow it to be used against him during the guilt phase of the case.

Counsel did initiate discussions with the prosecutor on the premise that, if Harris made a statement, there might be some consideration, or some kind of arrangement, as to a reduction of the charge or of the sentence requested. Evid.TR at 20–21; Haist Dep. at 35–36. This strategy was based on counsel's successful experience in another case. Counsel thought that it was "unconventional, but it could be done." Evid.TR at 20–21. Counsel testified that he "encouraged [Harris] to make that statement" and advised Harris that if he made the statement, that it might be useful to the prosecutor in the trial of the co-defendant, Bonds. *Id.* at 21–22. It

was also "[t]o get a good confirmed statement of Ben Harris's movements that night, what occurred the night of the Turner killing, so that the prosecutor could utilize that information not only in the Harris case, but in the Bonds case." *Id.* at 22–23. Counsel testified that he did not know what was in Harris's mind at the time of the statement, but in counsel's mind, the purpose was for plea negotiation. *Id.* at 24. Harris told Dr. Traywick in November or December, 1984 during his post trial evaluation, that he only said he killed Turner because counsel advised Harris that if Harris said he directly participated in the killing, he would be in a better position regarding sentencing. Vol. 2, VRP 876.

Counsel presented the option of making a statement to Harris by inquiring whether he [Harris] wanted to stick with his version of the facts. [Counsel] speculated that in the event Harris had been involved in the shooting of Turner himself, that might potentially provide a defense to the aggravating circumstance. That was [counsel's] view. He explained that, as I recall to Harris, and in light of that, he asked Harris whether or not he wanted to discuss any changes to his testimony.

Haist Dep. at 33–34. No research had been done on this subject before this discussion because there was no time. *Id.* at 34, 39–40.

The failure to investigate properly resulted in advice to make a statement of guilt without exploring the relevant facts or the impact of the statement. ABA Standard 4–6.2 addresses conduct of discussions with prosecutors. Generally, the defendant should be kept advised of developments at all times. Whether to have the defendant present during negotiations is risky unless the attorney has carefully gone over anticipated statements in advance. *See* Commentary at 4.75. Counsel must be careful not to understate or overstate the risks of the case in order to influence the client to plead guilty or to make a statement of guilt. *See generally* ABA Standard 4–5.1.

The court can fairly assume from considering the statement itself and the testimony of counsel, that the initial motivation for the statement was counsel's last ditch effort to eliminate the aggravating circumstance (solicitation for murder) from the trial. If successful, Harris would not face the death penalty. However, it is obvious that counsel and the prosecutor were not of the same mind. The prosecutor stated, "There have been no promises made between our office and you. We're not saying that we're going to do anything as a result of this statement. We're here, we're going to listen to his statement, and evaluate it thereafter. . . ." Plaintiff's Ex. 14, at 2. Counsel responded, "No. My understanding as to why we are here is if this statement meets the requirements at this time the charge would be reduced to murder in the first degree rather than aggravated murder. On that basis he is making this statement." *Id.* at 3. There is no indication in the expanded record what requirements, if any, had been discussed previously between counsel and the prosecutor, or related to Harris as inducement to make the statement. At that point, counsel's original advice to Harris was obsolete, as it was apparent that there was no specific agreement between counsel and the prosecutor. Counsel should have stopped the proceedings, and either clarified his understanding with the prosecutor or clarified his understanding with Harris.

Counsel's plan that the statement could be used as leverage to eliminate or weaken the prosecutor's case completely failed. Clearly, this plan was not thoroughly thought out, as Harris's statement only served to strengthen and corroborate the evidence against him, including circumstances supporting the aggravating element of solicitation for murder. Specifically, Harris stated he was doing drugs and alcohol at the time, and that he believed that Turner had damaged his car, which supplied a motive. Harris also stated that Turner owned him money, also a motive. Although he denied any solicitation of murder, Harris said he rendered assistance to Bonds by driving Bonds to Turner's location, providing Bonds with a gun, and to ensure death, even fired a second shot at Turner.

Counsel was apparently unaware that Harris's version of the events were implausible based on the forensic evidence. The record in this court is clear that Sgt Parkhurst, the investigating police officer, did not believe

that two individuals shot Turner, because of the locations of the bullet entries on Turner's body. Stip. Fact No. 84. Since the first shot was lethal, Sgt. Parkhurst believed that Turner would have fallen immediately, thereby making it impossible for Bonds to pass the gun to Harris to take a second shot. Stip. Facts No. 85, Parkhurst Evid.TR at 6–7. This information was contained in the police reports and autopsy, which were provided to counsel but was not elicited at trial. Stip. Facts Nos. 82 and 83.

After the statement was given, counsel failed to investigate or research any available grounds to avoid the admission of the statement into evidence, even though counsel knew, or should have known, that his original purpose of negotiation would have raised a question of admissibility under Washington State Rules of Evidence, ER 410. When his purpose failed, his trial strategy of general denial was eliminated. Counsel was left without a trial strategy hours before the trial began. In his own words, "The trial was a sham." Evid.TR at 45.

Competent counsel would have asked for a continuance. Cease Dep. at 45. Counsel did not bring the problem to the attention of the trial court in any way. Counsel explained "I wasn't in a position to do so. There's a time and tide in affairs, and I felt that away we go. You know, what kind of sense would that make? I ask for a continuance and then he changes his story. Counsel, you know that would be utterly dissembling to the hearing parties." Evid.TR at 49. Counsel's concern was unfounded. In post trial proceedings when the trial court learned that some of the psychological testing was not scored and included in the experts' opinion of Harris's mental health, the trial court stated: "I only wish the court had been informed of these matters, Gentlemen." Vol. 2, VRP 839. And,

> I am sorry, Gentlemen, that you did not advise me of the existence of this potential source of evidence before we proceeded with that sentencing phase. This creates problems, the magnitude of which is difficult to perceive.

Vol. 2, VRP 842.

The critical nature of Harris's statement cannot be overemphasized. It served to corroborate other witnesses' testimony. Its transcription was given to the jury as an exhibit and was used during their deliberations. The jury was free to study it carefully and weigh each word while assessing Harris's guilt, the aggravating circumstance, and the penalty.

 Perhaps even more egregious is counsel's decision to cure his tactical problems by putting Harris on the witness stand and waiving his Fifth Amendment protection against self incrimination at trial. It was not until the beginning of the trial that counsel determined that Harris must testify: "The trial was a sham, and the best thing I could think of to do was put Ben Harris on. If somebody is going to ring the bell, better he ring it himself." Evid.TR at 45. "The reason I called him as a witness was because he had made the statement, and as I earlier told you, I believed that the jury had better hear it from Mr. Harris rather than on some readout from the prosecutorial side." *Id.* at 48. "Had he not made the statement of the type that he made, there would have been no need to call him as a witness." *Id.* at 49. Generally, an attorney cannot waive a substantive right of his client, unless specifically authorized to do so. *State v. Dault*, 19 Wash.App. 709, 716, 578 P.2d 43 (1978). A defendant should not be bound by the decision of his attorney at a time when he did not fully understand his rights. *State v. Williams*, 87 Wash.2d 916, 921, 557 P.2d 1311 (1976) (citations omitted).

At trial, counsel stipulated to the admission of the statement as freely and voluntarily given by Harris. Vol. 2, VRP 565. Although counsel also opined that a CrR 3.5 hearing was not necessary, (*Id.*), counsel asked the court to advise Harris of his constitutional rights regarding a CrR 3.5 hearing to determine if the statement was made voluntarily. *Id.* at 566. The court did so and advised Harris of his panoply of rights but **only in the context of a CrR 3.5 hearing.** *Id.* at 566–69. The court never advised Harris of his right to remain silent before he took the witness stand, nor did counsel ask the court to do so. Harris never was advised

of, or waived, his right to remain silent during the trial.

Counsel took the extraordinary step of placing his client on the stand without any witness preparation, without a trial strategy, without a discernible purpose, without any certainty as to what Harris would say, and with some concern that Harris would perjure himself. Counsel, on direct examination, led Harris to the time immediately before the murder, leaving the prosecutor, without objection, to flesh out the details of the murder with Harris. This, as well as counsel's failure to have Harris address the aggravating circumstances, obviously had a very negative impact. Cease Dep. at 37–40. It is difficult to believe that at this critical point in the guilt phase Harris was making an informed and independent decision to testify and that he knew he did not have to testify, even though he had given a previous statement. In light of his questionable mental condition, a substantial question is raised as to whether he could have intelligently waived his right to silence. Counsel should have made a record as described in ABA Standard 4–5.2. *See also* Cease Dep. at 45–47. In either event, Harris was deprived of the protection of the Fifth Amendment. It is obvious that Harris's ill-advised testimony was prejudicial to him.

Counsel's failure to adequately protect Harris's rights pertaining to making and admitting the October 22, 1984 statement, and pertaining to Harris's testimony during the guilt phase fell below the objective standard of reasonableness and amounted to a deficient performance. There is a reasonable probability that, but for this deficiency, the result of the guilt and penalty phases would have been different, that is, the deficiency undermines confidence in the outcome.

### Ground G. Counsel should have attempted to mitigate with the prosecutor before the prosecutor decided to seek the death penalty.

█ Harris argues that counsel should have gone to the prosecutor immediately after counsel was appointed to attempt to convince the prosecutor that sufficient mitigating circumstances existed to negate the appropriateness of the death penalty. Harris contends that if counsel had done so, there was a likelihood that the prosecutor would not have filed notice of intent to seek the death penalty.

The state argues that there was insufficient time for that meeting to have realistically occurred. Because counsel was appointed four days before the notice of intent to seek the death penalty was filed, the state argues that counsel could not have conducted any kind of an investigation into the existence of mitigating circumstances in that short a period of time.

Defense counsel is under an obligation to take prompt action to protect the rights of the defendant. Often, some rights can only be protected by promptness. Counsel should take all necessary and good faith procedural steps to carry out this duty. *See* ABA Standard 4–3.6(a). A defense attorney, almost without exception, should contact the prosecutor immediately to convince him that death penalty is not appropriate. Cease Dep. at 15, 18, and 20.

Immediate discussion with the prosecutor before the decision to seek the death penalty is a task performed by competent defense counsel. Counsel did not attempt to dissuade the prosecutor from filing the notice of intent to seek the death penalty. It would be speculation at best to conclude that such efforts would have caused the result to be different. Overlooked in the discussion is the fact that the prosecutor could have withdrawn the death request at any time he was satisfied that mitigating facts called for that action. Even late attempts would be better than none at all.

Counsel's failure to attempt mitigation with the prosecutor before the death penalty was sought fell below the objective standard of reasonableness and amounted to a deficient performance. There is not, however, a reasonable probability that, but for this deficiency, the result of the guilt and penalty phases would have been different.

### Ground H. Counsel failed to conduct proper voir dire.

█ Harris contends that counsel was absent during part of the voir dire, leaving the

inexperienced associate to conduct it alone. *See* Stip. Facts No. 5. As a result, Harris contends he suffered prejudice.

The state finds no fault with the associate's performance. The state points out that counsel was absent only during the questioning of one prospective juror and that individual was dismissed. On this basis, the state argues that Harris cannot show prejudice.

The selection of jurors is a critical area of a jury trial, especially in a capital case. A lawyer should prepare himself to perform this function effectively. Because jury selection decisions are made under time pressures, a lawyer can only make those decisions wisely if he is adequately prepared for trial. *See* ABA Standard 4–7.2 and its commentary. This court reviewed the voir dire record and agrees with Harris's legal expert. The voir dire was appropriate for a "shoplifting case," was "totally inadequate" and did not accomplish any of the generally accepted purposes of voir dire. Cease Dep. at 34–37. While Harris is unable to point to any specific prejudice, the conduct of voir dire is another indication of his counsel's casual attitude toward his representation of Harris.

Harris is correct that the associate was inexperienced and unprepared to actively assist during voir dire. The associate testified that he had only conducted a voir dire "maybe in a DUI; one or two" times before his experience at Harris's trial. Haist Dep. at 42. The associate had done no preparation for voir dire in a capital case but was directed to proceed by the trial court. *Id.* at 42–43. However, the associate performed only a small part of the voir dire.

Counsel's performance during voir dire was not exemplary. Counsel's failure to conduct proper voir dire fell below the objective standard of reasonableness and amounted to a deficient performance. There is not, however, a reasonable probability that, but for this deficiency, the result of the guilt and penalty phases would have been different.

### Ground I. Counsel failed to object to inadmissible evidence.

 Harris contends that counsel failed to object to the admission of his 1969 prior convictions at the penalty phase.

The state argues that counsel did not object to the prior convictions because counsel believed that this evidence was admissible and any objection would have been meritless.

This legal aspects of this ground are discussed in Issue No. 2, *infra.* There were arguable grounds for objection to the admission of the convictions. The associate was concerned about the issue, but testified that it was counsel's "call." "He was attorney of record. He was calling the shots as we went along." Haist Dep. at 45. Counsel should have objected to the prior convictions, even if success was doubtful. Cease Dep. at 43–44, 50–51, 60.

The court notes that there were other questionable items of evidence that counsel did not object to. One particular example is testimony regarding a list of people Harris intended to kill for various reasons. The evidence was of doubtful relevance in the guilt phase, and was highly prejudicial. Without a challenge to its relevance or admissibility under ER 403, this evidence was established as factual, and was cited as indicative of Harris's murderous propensities. *See, e.g., State v. Harris,* 106 Wash.2d at 799, 725 P.2d 975; Report of the Trial Court, Vol. 4, CP 1660. Although this court gives no opinion on the admissibility of that evidence, some challenge to it should have been made, either by objections during testimony or in a motion *in limine* before the testimony.

Counsel's failure to object to certain questionable evidence fell below the objective standard of reasonableness and amounted to a deficient performance. There is not, however, a reasonable probability that, but for this deficiency, the result of the guilt and penalty phases would have been different.

### Ground J. Counsel failed to develop a viable defense strategy.

 Harris argues that counsel did not present a viable defense on his behalf. Harris attacks counsel's decision to place him on the witness stand, because Harris's version of events were not supported by physical evidence. Because counsel did not conduct an adequate investigation, including an inde-

pendent evaluation of physical evidence, Harris argues that counsel was unaware that the forensic evidence did not support his testimony, or that his testimony was inconsistent with other witnesses.

The state argues that Harris cannot prove that counsel improperly advised him to make a statement or to testify. The state also argues that Harris had made inculpatory statements to others, for example to Robin Taylor, a woman with whom Harris was intimate.

Competent counsel, acting effectively, should have a solid trial theory, developing from the initial contact with the defendant, and an alternative theory. There was no discernible defense theory throughout the trial—not even a general denial. Cease Dep. at 26–27. Counsel testified that the defense would be general denial; to force the state to prove their case and to challenge their witnesses. Evid.TR at 10–11. What trial strategy there was, was developed while the trial proceeded. *See* Grounds A and B, *supra.* The strategy of general denial changed after the October 22, 1984 statement to a denial of the aggravating circumstance only. But there was no clear effort to even attack the state's proof on that issue.

Failure to develop a viable defense is shown in other ways. Not only did counsel fail to investigate the forensic evidence independently, but there is no showing that Sgt. Parkhurst was a qualified ballistics expert, capable of rendering an expert opinion on the entries of the bullets in relation to the precise cause of death. The court notes that counsel for Bonds had a demonstration video tape made of the events of shooting to raise doubts about how the murder really occurred. Harris's counsel created no defense aids. Finally, because counsel only interviewed 3 of the witnesses who testified at trial, counsel was not aware of the inconsistencies between Harris's testimony and other witnesses.

Counsel had no strategy for presentation of mitigating evidence, as discussed in Ground N, *infra.*

Harris has shown here, and in other grounds, that counsel failed to present a viable defense, or had any clear, discernible defense strategy. A viable defense is necessary to reasonably competent representation. Counsel's failure to develop a viable defense strategy fell below the objective standards of reasonableness and amounted to a deficient performance. There is a reasonable probability that, but for this deficiency, the result of the guilt and penalty phases would have been different, that is, the deficiency undermines confidence in the outcome.

**Ground K. Counsel failed to propose, or except to, jury instructions.**

■ Harris argues that counsel did not propose any jury instructions in the guilt phase, and failed to object to any proposed instruction offered by the state in either the guilt or the penalty phase. *See* Stip. Facts No. 93.

In the guilt phase, counsel failed to submit any jury instructions, or to argue the merits of submitting instructions on lesser included offenses. Counsel, in his closing argument in the guilt phase, told the jury that the murder amounted to no less than second degree murder, "And I'm sure the court would have given us instruction there are lesser degrees of crime, yet." Vol. 2, VRP 766.

In the penalty phase, the record reflects that counsel did not offer jury instructions defining manslaughter, the subject of the admitted 1969 prior conviction. As discussed in Issue No. 2.C, a manslaughter is not a murder and may be based only on negligence. Without clarification, the jury was free to believe the prosecutor when he warned them in his closing argument at the penalty phase, that "Harris has killed before." Vol. 2, VRP 815. This view was adopted by the trial court and included in his report. *See* Vol. 4, CP 1660.

Issue No. 18, *infra,* also discusses two erroneous jury instructions given at the penalty phase. The record reflects that counsel did not object to these instructions, either.

Counsel's failure to object or propose jury instructions in a capital case fell below the objective standards of reasonableness and amounted to a deficient performance. There is a reasonable probability that, but for this

deficiency, the result of the penalty phase would have been different, that is, the deficiency undermines confidence in the outcome. There is not, however, a reasonable probability that, but for this deficiency, the result of the guilt phase would have been different.

### Ground L. Counsel failed to object to improper comments by prosecutor during closing argument in penalty phase.

 Harris argues that counsel failed to object to improper comments by the prosecutor during the closing argument in the penalty phase. This ground is more fully addressed in Issue No. 9, *infra.*

The state argues that any objection was meritless and would have been overruled. The state also contends that Harris cannot show either error or prejudice in counsel's failure to object.

The state's argument is essentially correct on this part of this ground. However, competent counsel would have objected to preserve the issue for later appellate examination.

The court also notes that the prosecutor made an important misstatement of the law during his closing argument in the guilt phase. He shifted the burden of proof to the defendant by stating:

> What would you have to do, logically, under these jury instructions with the evidence you've heard to find him not guilty? To find him not guilty, you'd have to determine, first off, that he didn't kill anybody, or solicit or command anybody to be killed, you'd have to find that he was not an accomplice with Bonds in any way, you'd have to find, I submit to you, that Bonds exited the vehicle, as Harris said, went over there with the idea to kill Turner, killed Turner, that this was done with no connection by Harris at all, that he wasn't helping or aiding in any way, and that Turner died immediately, and that Harris then took the gun knowing he was dead, and shot him. That would be, I submit to you, the only logical way you could come up with a verdict of not guilty.

Vol. 2, 745–46. This statement is incorrect. To find Harris not guilty of anything, the jury must have a reasonable doubt about any element of the offense charged. Clearly, counsel should have also objected to this argument.

Counsel's failure to object to improper prosecutorial argument fell below the objective standards of reasonableness and amounted to a deficient performance. There is not, however, a reasonable probability that, but for this deficiency, the result of the guilt phase would have been different.

### Ground M. Counsel's closing argument in the guilt phase was deficient.

 During counsel's closing argument in the guilt phase of the trial, he referred to Harris in a very negative way. He told the jury that Harris was a liar about 85% of the time. Counsel said that Harris probably told the truth about being a male member of a very small society of men who do not work, carry weapons, and have a sense of honor and bravery that is demonstrated when one kills someone. He described Harris has having ins and outs with several young women, having cars that do not work, drinking a lot, and trying to be funny in a capital murder trial. Counsel said that Harris had a different moral code, that he is a thief, and a money lender on the side. Vol. 2, VRP 760–777.

After establishing Harris in this light, counsel then tried to convince the jury that Harris tried to confess to the murder, that Harris had no money to pay off any contract, and that although Harris may not be believable on this, that Harris denies that the solicitation for murder, the aggravating circumstance, took place. Counsel advised the jury not to engage in finding the truth among the witnesses. "I don't think that you ought to go so far as to decide who told the truth. It appears to me that there is ample room for any trier of fact to decide that you have heard a bundle of liars from the word go here, excepting the lawyers, of course." Vol. 2, VRP 775–76.

The court should not second guess counsel's trial strategy here, or elsewhere in the course of the trial. However, these argu-

ments were beyond any discernible trial strategy, and were outrageous. They did not support a reasonable defense theory, and can be construed to be racist and stereotypical. (Harris is an African–American.) The one person in the courtroom who is professionally obligated to display a sense of loyalty and advocacy has described Harris in such a way that left him with little or no credibility, no humanity, and no means to be identified as a peer of the jury. Further, it was counsel's strategy to put Harris on the witness stand only because counsel did not have any other strategy. Not surprisingly, Harris made statements inconsistent with some of his other statements, but consistent with his mental problems. Rather than protect Harris, counsel argued to the jury to disregard most of Harris's statements as unreliable and dishonest.

When this ground is considered in the totality of all circumstances, there is no sound trial strategy that supports counsel's statements about Harris.

Counsel's closing argument in the guilt phase fell below the objective standards of reasonableness and amounted to a deficient performance. There is a reasonable probability that, but for this deficiency, the result of the guilt phase would have been different, that is, the deficiency undermines confidence in the outcome.

### Ground N. Counsel failed to present available evidence during penalty phase.

■ Harris argues that counsel's failure to present any readily available mitigating evidence during the penalty phase deprived him of a fair trial, his Sixth Amendment right to effective assistance of counsel, and due process of law. Harris lists numerous facts that, he argues, fit neatly into the category of mitigating circumstances, such as his delusional mental condition, academic problems beginning in early childhood, poor family relationships, mental health problems including suicide attempts, and paranoid thinking which began in early childhood. Harris relies heavily on *Mak v. Blodgett*, 970 F.2d 614 (9th Cir.1992) and cases cited therein.

The state argues that if the court heeds the requirement of *Strickland, supra,* and evaluates counsel's performance at the time of counsel's conduct, it will be clear that his tactical decisions and defense theories fall within a range of professional competence. The state also contends that Harris cannot demonstrate actual prejudice, as he cannot convincingly show that the mitigating evidence he believes existed at the time would have resulted in a different result at trial.

This discussion must begin with a reminder that this ground focuses on the penalty phase of a capital case. In this phase, the jury has considered evidence which convinced them of the defendant's guilt and is determining whether the defendant should live or whether he should die. RCW 10.95.-060; 060(4). The defense role in the penalty phase is to present evidence to convince each member of the jury not to vote to have the defendant killed. To achieve this goal, defense counsel should humanize his client, overcome the common prosecutorial position that the defendant is evil, and to provide to the jury with reasons for the defendant's conduct by explaining the forces in the defendant's life that could have led up to the circumstances of murder. *See generally* Ex. C to Petitioner's Motion to Expand the Record, Stebbins, David C. and Kenney, Scott P., *Zen and the Art of Mitigation Presentation, or, The Use of Psycho–Social Experts in the Penalty Phase of a Capital Trial,* The Champion, August, 1986, 87H–37.

■ The Eighth Amendment to the Constitution states "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." In a capital case, it requires that the death penalty be the appropriate punishment in a specific case, and that it can only be imposed after adequate consideration of factors that might warrant mercy. *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 2991–92, 49 L.Ed.2d 944 (1976); *California v. Brown,* 479 U.S. 538, 554, 107 S.Ct. 837, 845–46, 93 L.Ed.2d 934 (1987). Mitigating evidence allows the consideration of "compassionate or mitigating factors stemming from the diverse frailties of humankind ... [and] constitutionally indispensable part of the pro-

cess of inflicting the penalty of death." *Woodson v. North Carolina,* 428 U.S. at 304, 96 S.Ct. at 2991. *See also Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); *Deutscher v. Whitley,* 884 F.2d 1152, 1161 (9th Cir.1989). The sentencer must "not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Eddings v. Oklahoma,* 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982). *See also Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

In evaluating counsel's performance in this case, the court must apply the two part test of *Strickland v. Washington,* 466 U.S. 668, 687–88, 694, 104 S.Ct. 2052, 2064–65, 2068, 80 L.Ed.2d 674 (1984): 1) that counsel's performance fell below objectively reasonable standard; and 2) that there is a reasonable probability that the result of the proceedings would have been different.

■ When a lawyer fails to present evidence in the penalty phase of a capital case, the conclusion that his performance is deficient does not always follow. Counsel, after adequate investigation, may believe that the presentation of other evidence would open the door to damaging rebuttal evidence from the prosecutor, (*Campbell v. Kincheloe,* 829 F.2d 1453 (9th Cir.1987)), or might be inconsistent with the overall defense strategy (*Burger v. Kemp,* 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987); *Harris v. Vasquez,* 949 F.2d 1497 (9th Cir.1990)). Here, however, failure to advance mitigation evidence at the penalty phase was deficient and prejudicial. Cease Dep. at 49.

It cannot be said that absolutely no mitigating evidence was presented in the Harris case. Counsel offered Harris's testimony explaining his two prior convictions. Vol. 2, VRP 681–89. Harris gave some positive details that he had complied with the terms of probation for two years after the manslaughter conviction; that he graduated from high school; that he worked at Boeing as an inspector and at Safeway as a night stock clerk; that he was married for 11 months and had one male child; and was divorced.

Harris testified that his son lived with his mother for several years, later with Harris and Harris's mother, and after Harris's mother died in December, 1983, the boy lived with Harris and Abel Lawrence, his stepfather. Harris testified that the boy had been in some criminal trouble and that Harris had supported the boy until Harris suffered a hand injury. He testified about other jobs in which he had been employed, such as foundry work, warehouseman, laborer for General Services Administration. He explained that his hand injury was disabling and prevented him from full employment. Harris spoke of his feelings regarding Turner's death. "It's something that should have been avoided. In fact, I was shot at, that night, twice." "Q. Well, do you have any personal sorrow for it? A. Absolutely." Vol. 2, VRP 804.

Counsel also called Reverend Earnest S. Brazil, a local minister who testified that he had known Harris for 18–20 years. Rev. Brazil testified that, as a child, Harris and his family attended church regularly but that Harris has not done so since the death of his mother. Brazil stated that Harris seemed "a very nice young man, quiet, respectable, especially toward seniors, as such. And he always have had high respect for me." Vol. 2, VRP 806. Brazil also stated that he thought Harris was not totally irredeemable and that would be some things Harris could contribute to society if he were incarcerated. Vol. 2, VRP 690–91. None of this evidence was particularly meaningful or effective. It was clear that Rev. Brazil did not know Harris well.

Harris now presents numerous witnesses and documentary evidence which counsel did not present at the penalty phase. There is a large volume of information detailing mental and emotional problems beginning in the first grade of school. Harris has a well documented history of delusional thinking, paranoia, suicidal tendencies, substance abuse, and depression. Stip. Facts Nos. 71 through 81 show that counsel did not interview various family members and thus did not know the full scope of Harris's delusional beliefs. Harris now presents numerous letters which he wrote to counsel, police officers, court, family members which are re-

plete with nonsensical information and bizarre beliefs. Ex. H to Stip. Facts. Harris was not evaluated by his own psychological expert as to his mental state. The evaluating team at Western State Hospital was not presented with Harris's full psychological full background. Positive aspects of Harris's personality were not explored or presented. The dismissal of the manslaughter conviction, complete with the positive reasons for it, was not presented to the jury.

In Washington, each member of the jury must be convinced that there are no sufficient mitigating circumstances to merit leniency. RCW 10.95.060(4). Thus, one juror can prevent the death penalty. If the defendant can show that counsel's deficient performance by failing to present other mitigating evidence would have allowed any juror to vote against the death penalty, then he has shown that the result would have been different. This is known as the "effect-on-one-juror approach," which was first approved in *Kubat v. Thieret*, 867 F.2d 351, 371 (7th Cir.1989), and recently adopted in *Mak v. Blodgett*, 970 F.2d at 621. The Ninth Circuit determined that this approach is consistent with the *Strickland* analysis. "*Strickland* does not stand for the proposition that a court cannot consider the effect of counsel's deficient performance on a single juror, but rather that the court cannot consider the possibility that a juror would render a decision not based on the law but based on that juror's idiosyncrasies." *Id.*

There is a reasonable probability that the admission of mitigating evidence about Harris would have caused one or more jurors to believe that death was not the appropriate punishment. This conclusion follows from consideration of the type and content of the available mitigation evidence, and is strengthened by consideration of counsel's other deficiencies in performance. Certainly, the testimony of many witnesses as to Harris's successful work history and disability affecting his employability would have bolstered Rev. Brazil's conclusory statement that Harris could still contribute to mankind. Presentation, after appropriate pretrial investigation, of Harris's delusional beliefs, mental history, and mental status would have

given the jury an additional explanation for Harris's motive for the murder—that it was an irrational act, and not based on car tampering and debt. Generally, car tampering and debt, even if true, do not lead to murder.

Presentation of this additional evidence would also have allowed the jury to reconsider the impact of some of the evidence admitted in the guilt phase. Counsel's original strategy of general denial was destroyed by Harris's admission to the murder the morning of trial. Harris's statement was unreliable because of his mental condition, and because it was not consistent with available forensic evidence. Admission of that statement in the guilt phase set the stage for the jury in the penalty phase to find that Harris was a liar and a murderer. Counsel, in his closing argument to the jury in the guilt phase removed any shadow of a doubt that Harris was anything less than that.

Allowing admission of the prior conviction of manslaughter without admission of its subsequent dismissal and without a definition of manslaughter fell below objective standards of reasonableness. That evidence led the jury to an erroneous view of Harris's criminal history, which was capitalized on by the prosecutor without objection.

There is no showing that these failures of counsel were based on a reasoned decision or that submission of mitigation evidence would have resulted in harmful rebuttal evidence. Counsel simply failed to present available evidence, and as a result his representation fell below the objective standard of reasonableness. Such failure is violative of the Sixth Amendment. *See, e.g., Deutscher v. Whitley*, 884 F.2d 1152, 1159–62 (9th Cir. 1989); *Mak v. Blodgett*, 970 F.2d at 621. Under these circumstances, Harris's death sentence was almost inevitable. *See, e.g., Evans v. Lewis*, 855 F.2d 631, 637 (9th Cir. 1988).

Counsel's failure to present available mitigating evidence during the penalty phase fell below the objective standards of reasonableness and amounted to a deficient performance. There is a reasonable probability that, but for this deficiency, the result of the penalty phase would have been different, that

is, the deficiency undermines confidence in the outcome.

### Ground O. Counsel failed to raise or preserve meritorious issues in appellate proceedings.

■ Harris contends that counsel did not raise all the appropriate issues in the direct appeal and therefore, he has been prejudiced in obtaining appellate relief.

A corollary issue is whether, in his motion to withdraw before the appellate proceedings began, counsel should have advised the court that Harris's strongest ground for appeal may be ineffective assistance of counsel. Counsel's motion to withdraw did not state any reasons. Vol. 4, CP 1661. The motion was considered in two separate hearings, on January 25, 1985 (Vol. 2, VRP 928–32), and on April 11, 1985 (Vol. 2, VRP 935–40). Counsel was not present at either hearing. Harris was represented by the associate. Although the associate did indicate that there may be an ineffective assistance of counsel claim, no specific reasons for withdrawal were presented to the trial court. The ineffective assistance claim, perhaps Harris's strongest claim of error, should have been a ground for appeal.

The court also notes that counsel did not correct several inaccuracies in the trial court's report to the Washington Supreme Court. Vol. 4, CP 1648–60. These inaccuracies are that Harris had high intelligence (CP 1649); very poor work record (p. 3); no reference to the dismissal of the manslaughter conviction (CP 1650) or correction to the statement that counsel had "gotten him off with manslaughter" (CP 1656); no note of the co-defendant Bonds and his disposition (CP 1652); and no clarification of the statement "This was the first of four or five that defendant was contracting to have killed. He has killed before and would do it again." (CP 1660). These inaccuracies appeared to have been accepted as facts, although there is no clear support for them in the evidence. Counsel's failure to correct these errors is significant because the trial court's report can be characterized as factfinding. *See Burden v. Zant*, 498 U.S. 433, 436–37, 111 S.Ct. 862, 864–65, 112 L.Ed.2d 962 (1991).

Counsel also failed to make an adequate record regarding the proportionality review in the Washington Supreme Court.

Counsel's failure to raise or preserve meritorious issues in appellate proceedings fell below the objective standards of reasonableness and amounted to a deficient performance. There is not, however, a reasonable probability that, but for this deficiency, the result of the appellate proceedings would have been different.

### Ground P. Counsel failed to advise Harris of a conflict of interest.

■ Harris argues that he and many members of his family had been provided legal services by counsel and counsel's law firm since the early 1960s. Stip. Facts No. 13. Those services included criminal charges against Harris in May, 1968 (Stip. Facts No. 14); representation of Mrs. Harris by counsel's partner for a dissolution of marriage in 1968 (Stip. Facts No. 15); criminal charges against Harris for an alleged assault on Mrs. Harris in May, 1969 (Stip. Facts No. 16); criminal charges for murder against Harris in 1968 resulting in a plea to manslaughter (Stip. Facts Nos. 17 and 18); and probate proceedings on behalf of the estate of Bessie M. Robinson Lawrence, Harris's mother, representing Lawrence, the administrator and widower of Mrs. Lawrence beginning in December, 1983 (Stip. Facts Nos. 21, 22, 12).

Harris's mother died intestate on December 10, 1983. Stip. Facts No. 20. The probate proceedings continued during the time of counsel's representation of Harris in the instant case. Harris argues that he and Lawrence had a hostile relationship and Harris believed that Lawrence and other family members conspired in many ways, including the aggravated murder charges, so that he would be eliminated as a heir of any portion of his mother's estate. Stip. Facts Nos. 24, 28, and 41.

Harris contends that counsel was aware of the animosity between Harris and Lawrence. Stip. Facts Nos. 25, 26, and 49. Harris contends that the legal interests of his stepfather, other family members and himself were adverse, and may explain counsel's fail-

ure to interview or call family members to testify during the penalty phase of his trial. He also argues that counsel's failure to put forth evidence of Harris's troubled family background and relationships, including school and medical records, effectively protected other family members from public and unpleasant scrutiny. Harris adds that counsel failed to seriously evaluate Harris's statements that the murder charges were brought as a result of a family conspiracy because counsel either believed the family had more credibility than Harris, or that Harris's fabrication of these events and beliefs was part of his regular delusional mental state, accepted as normal by counsel. As a result, Harris argues, there was a conflict of interest which deprived him of a fair trial and effective assistance of counsel.

The state disputes the allegations that counsel's representation of Harris's stepfather in probate proceedings amounted to a conflict of interest. The state argues that because Harris was an heir to his mother's estate and Lawrence, as the administrator of the estate, acted in a fiduciary capacity, there was no adverse legal interest between the two men. The state also argues that Harris has not shown that counsel's representation of Harris was adversely affected by the personal interests of Lawrence.

 The Sixth Amendment mandates that a criminal defendant receive effective representation of counsel that is free from conflicts of interests. *Wood v. Georgia*, 450 U.S. 261, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981) (conflict found where defendant's employer paid defendant's counsel); *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) (conflict of interest with simultaneous representation of prosecution witness and defendant). In a criminal context, the need to protect the criminal defendant from conflict of interest is greater than in a civil case. This is attributed in part to the clients's stress when confronted with the enormity of the criminal justice system. "[T]he client will be eager to obtain any representation as soon as possible and thus will not be particularly cautious in evaluating a potential conflict even when it has been disclosed." ABA Standard 4–3.4; Commen-

tary at 4.40. The responsibility thus weighs heavily on both attorneys and trial courts, who are obligated to protect defendants against conflicts of interest. *Id.* If an error is determined, prejudice to the defendant is presumed. *Holloway v. Arkansas*, 435 U.S. 475, 490, 98 S.Ct. 1173, 1181–82, 55 L.Ed.2d 426 (1978). The reasoning behind this high standard is aptly stated in *Holloway v. Arkansas, supra.*

[I]n a case of joint representation of conflicting interests the evil—it bears repeating—is in what the advocate finds himself compelled to *refrain* from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing process. It may be possible in some cases to identify from the record the prejudice resulting from an attorney's failure to undertake certain trial tasks, but even with a record of the sentencing hearing available it would be difficult to judge intelligently the impact of a conflict on the attorney's representation of a client. And to assess the impact of a conflict of interests on the attorney's options, tactics, and decisions in plea negotiations would be virtually impossible.

435 U.S. at 490–91, 98 S.Ct. at 1182 (emphasis in original).

Conflict of interest issues are governed in part by the Code of Professional Conduct for lawyers and cases applying and interpreting the code. Generally, a potential conflict of interest may exist if 1) an attorney's representation of a client is directly adverse to another client, or 2) an attorney gained confidential information or secrets from a previous client that might be material to the new client's case. If a potential conflict of interest arises, a lawyer is obligated to fully disclose the material facts of the potential conflict to the client and obtain the client's written consent to representation after the disclosure. *See* Rules for Professional Conduct, Rules 1.7, 1.8, 1.9 and 1.10. In 1983 and 1984, the rules of professional responsibility were essentially the same, but they were known as the Canons of Professional Ethics. The canons pertaining to a lawyer's duties when a potential conflict of interest exists were Canons 6 and 37. Canon 6 stated:

Adverse Influences and Conflicting Interests. It is the duty of a lawyer at the time of retainer to disclose to the client all the circumstances of his relations to the parties, and any interest in or connection with the controversy, which might influence the client in the selection of counsel.

It is unprofessional to represent conflicting interests, except by express consent of all concerned given after a full disclosure of the facts. Within the meaning of this canon, a lawyer represents conflicting interests when, in behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose.

The obligation to represent the client with undivided fidelity and not to divulge his secrets or confidences forbids also the subsequent acceptance of retainers or employment from others in matters adversely affecting any interest of the client with respect to which confidence has been reposed.

Canon 37 stated:

Confidences of a client. It is the duty of a lawyer to preserve his client's confidences. This duty outlasts the lawyer's employment, and extends as well to his employees; and neither of them should accept employment which involves or may involve the disclosure or use of these confidences, either for the private advantage of the lawyer or his employees or to the disadvantage of the client, without his knowledge and consent and even though there are other available sources of such information. A lawyer should not continue employment when he discovers that this obligation prevents the performance of his full duty to his former or to his new client.

*See Kurbitz v. Kurbitz*, 77 Wash.2d 943, 944, 468 P.2d 673 (1970).

Generally, a lawyer owes a client a duty of loyalty that goes beyond the case at issue. The ABA Model Rules of Professional Conduct, Rule 1.7 advises that a lawyer "ordinarily may not act as advocate against a person the lawyer represents in some other matter, even if it is wholly unrelated." *State v. Hatfield*, 51 Wash.App. 408, 412 n. 1, 754 P.2d 136 (1988). A conflict of interest may be established by "reasonable inference. In

this field [legal profession], conduct should not be weighed with hairsplitting nicety." *Id.* 77 Wash.2d at 946, 468 P.2d 673. The burden of proving a conflict of interest is not on the client. Rather, the attorney's right to practice law gives way in cases where there is a question, in order to protect the public interest. *Id.* (quoting *Chugach Elec. Ass'n v. United States Dist. Court for Alaska*, 370 F.2d 441, 444 (9th Cir.1966)). The *Chugach Elec.* decision further held that actual knowledge possessed by an attorney which might be adverse to a client is not the test. "It is sufficient that an appearance of conflicting interests has been made." 77 Wash.2d at 947, 468 P.2d 673.

Two general factors were considered when analyzing conflict of interest issues in the *Kurbitz* decision. One, "whether the matters embraced within the pending suit involving an attorney's former client are substantially related to matters on which the attorney or someone in his association previously represented the former client"; and two, "if the attorney in the present litigation did not formerly represent the adverse client, but had access to confidential information which is material to the present suit...." 77 Wash.2d at 947, 468 P.2d 673 (citations omitted). There, the court found a conflict of interest where a lawyer and his law firm represented at various times the following entities belonging to the same family: a husband and wife for a loan against the wife's mother's estate, the wife's mother's estate, and the wife in a divorce proceeding. A conflict of interest can arise where a lawyer represents an administrator of an individual's estate and a claimant of the estate. *Id.* The conflict can be resolved when, after full disclosure, the claimant and the administrator agree on the disposition of the claim. *In re Estate of Rakestraw*, 28 Wash.App. 585, 586, 624 P.2d 1175 (1981).

In a criminal context, conflict of interests commonly arise where a lawyer has the opportunity to represent two or more co-defendants. Those rules do not apply here. However, the simultaneous representation of a defendant and a witness with opposing interests can create a conflict of interest situation.

*In re Richardson,* 100 Wash.2d 669, 677 (1983) (and cases cited therein).

Here, Harris's arguments of conflict of interests arise in more than one context. His arguments regarding counsel's simultaneous representation of Lawrence and Harris can be analogized to that of a personal representative of an estate and a claimant to an estate with an adverse interest. *See, e.g., In re Estate of Rakestraw,* 28 Wash.App. 585, 624 P.2d 1175 (1981). The parties have stipulated that Harris had concerns about the probate of his·mother's estate and believed that Lawrence and other family members did not want him to share in the estate. Stip. Facts Nos. 24, 25, 28, 64, and 74. The parties have also stipulated that counsel and the police were well aware of Harris's irrational beliefs. Stip. Facts Nos. 25, 41. The adversity between Lawrence and Harris is well documented and at times there were rumors of an attempt on Lawrence's life. Stip. Facts Nos. 39, 40, 46, and 47. Harris made allegations that his mother had executed a will before her death, that she did not advise her husband of the will but told Harris where it was located. Stip. Facts Nos. 42 and 44. Harris believe that counsel was investigating the existence of the will. Stip. Facts No. 45. These facts appear to demonstrate that Lawrence and Harris had very different, and adverse, views of the distribution and administration of Mrs. Lawrence' estate. The estate was approximately valued at $150,000 in January, 1984. *See* Ex. B to Stip. Facts.

If Harris's arguments are viewed from the standpoint of the simultaneous representation of a defendant and a witness, adverse interests can be demonstrated. Counsel failed to interview and call available and willing family members to testify to mitigating circumstances on behalf of Harris. As cautioned in *Holloway v. Arkansas,* 435 U.S. at 490–91, 98 S.Ct. at 1181–82, the prejudice stemming from conflicting interests may be demonstrated by an attorney's failure to undertake certain tasks. Counsel's restraint may have its genesis in confidential information gained through his representation of Lawrence, or Mrs. Linda Harris Carson (Harris's ex wife who was represented in the divorce by counsel's partner). Harris did

express his concern about counsel's representation of him on appeal. Harris accepted, at the trial court's urging, counsel's appointment, but only after conditioning his acceptance on counsel's pledge not to listen to his family during the pendency of the appeal. Vol. 2, VRP 938–40.

It should be noted that counsel was appointed by the court, and was not retained by Harris. It should also be noted that, at least after Harris started blaming Lawrence for his troubles, an *apparent* conflict of interest existed. A careful review of the record does not demonstrate that counsel received any written consent from Harris regarding possible conflicts of·interest or that counsel advised the trial court of the possibility of conflicts. Because of counsel's failure, the trial court was not able to make inquiry. No state court has addressed the facts pertaining to this issue on their merits. It is very difficult to determine whether an *actual* conflict of interest existed in 1984. It is clear, however, that counsel was ethically obligated to take some affirmative action.

Counsel's failure to advise Harris of a conflict of interest fell below the objective standards of reasonableness and amounted to a deficient performance. There is a reasonable probability that, but for this deficiency, the result of the guilt and penalty phases would have been different, that is, the deficiency undermines confidence in the outcome.

**Conclusion—Issue No. 1**

Harris's Sixth Amendment right to effective assistance of counsel was violated by counsel's deficient performance during the guilt and penalty phases. As a result of this constitutional error, there was substantial and injurious effect or influence in determining the jury's verdicts. This conclusion is based on the prejudice of individual, specific deficiencies and on the cumulative effect of all deficiencies.

***ISSUE NO. 2: Whether the admission of prior convictions in 1969 for manslaughter and assault during the penalty phase violated petitioner's right to due process.***

This issue will be addressed in three parts. The first part of this issue pertains to the

notice requirement set forth in Washington's Evidence Rule, ER 609(b). Harris contends that his due process rights were violated because he did not receive advance notice from the prosecutor of the prosecutor's intent to submit his prior convictions in the penalty phase. He argues that, as a result, he was deprived of his opportunity to contest their constitutional validity.

In the second part of this issue, petitioner contends that his due process rights were violated because the judgment and sentence for the prior conviction of manslaughter was based on an invalid plea of guilty and should not have been admitted. *See* Plaintiff's Ex. 1, penalty phase. (The judgment and sentence for the crime of Assault in the Third Degree was based on a jury verdict of guilty. *See* Plaintiff's Ex. 2. This conviction was not appealed, and there is no basis for any collateral attack on the conviction itself.)

The third aspect of this issue is whether there were any constitutional violations pertaining to the application of Washington's Rules of Evidence, which permitted the admission of these convictions in the penalty phase. ER 803(a)(22). Although this aspect was not specifically raised by the parties, it is appropriate to address it summarily.

### A. Failure of the Prosecutor to comply with ER 609(b)

 The record reflects that the two prior convictions were over 10 years old at the time of trial. They were admitted into evidence during the state's presentation in the penalty phase, without objection from defense counsel. *See* Vol. 2, VRP 795. ER 609(b), in pertinent part, states: "evidence of a conviction more than 10 years old as calculated herein, is not admissible unless the proponent gives to the adverse party sufficient advance written notice to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence." The court has carefully reviewed the entire state court record in this case and can find no advance written notice that the prosecutor intended to use these two prior convictions during the penalty phase.

However, ER 609 only pertains to the impeachment of a witness' credibility. *See*

ER 609(a). Since the prior convictions were not admitted for impeachment purposes, this rule does not apply. Therefore, there was no constitutional error.

### B. Deprivation of due process by admission of unconstitutional prior conviction

 Harris contends that his due process rights under the Fifth and the Fourteenth Amendments were violated by the unopposed admission of his 1969 prior convictions in the penalty phase. The judgment and sentence for both of these convictions were exhibits in the penalty phase, and constituted the prosecutor's entire case. Plaintiff's Ex.s 1 and 2, Phase II, Vol. 2, VRP 794–95.

The Washington Supreme Court has determined that, during the state's presentation of evidence in the penalty phase of a capital case, there are three classes of nonstatutory aggravating evidence. "Specifically, evidence of nonstatutory aggravating factors must be limited to defendant's criminal record, evidence that would have been admissible at the guilt phase, and evidence to rebut matters raised in mitigation by the defendant." *State v. Bartholomew*, 101 Wash.2d 631, 642, 683 P.2d 1079 (1984). Contrary to petitioner's arguments, Harris's criminal history may be admissible in the penalty phase regardless of whether it would be admissible during the guilt phase. A discussion of the various rules of evidence follows in Sec. C.

Harris next contends that his plea of guilty to the manslaughter conviction was invalid because there was no evidence at the time of the plea of guilty, that 1) he was aware of his right not to incriminate himself, to remain silent and/or not to plead guilty; 2) he was aware of the nature of the charges against him; and 3) there was a factual basis for the prior charges.

The state argues that Harris was represented by the same counsel as in his capital case, and that counsel was well aware of the circumstances of the plea. The state contends that, on the face of the Judgement and Sentence itself, the trial court ascertained that defendant understood the enumerated rights and was fully advised. *See* Plaintiff's

Ex. 1, penalty phase. Therefore, the state argues that there is no factual basis to petitioner's allegations of due process violations.

■ In order to collaterally attack a prior conviction by plea of guilty, the petitioner must show that the guilty plea proceedings did not include a constitutionally valid waiver of all rights. "A guilty plea, which works as a waiver of numerous constitutional rights, cannot be truly voluntary if the defendant 'has such an incomplete understanding of the charge that his plea cannot stand as an intelligent admission of guilt.'" *Marshall v. Lonberger*, 459 U.S. 422, 431, 103 S.Ct. 843, 849, 74 L.Ed.2d 646 (1983) (quoting *Henderson v. Morgan*, 426 U.S. 637, 645, n. 13, 96 S.Ct. 2253, 2257, n. 13, 49 L.Ed.2d 108 (1976)). The U.S. Supreme Court elaborated further on the concept of voluntariness in the *Marshall* decision. A guilty plea cannot be considered voluntary as an intelligent admission "unless the accused has received 'real notice of the true nature of the charge against him, the first and most universally recognized requirement of due process.'" *Marshall, id.* 459 U.S. at 436, 103 S.Ct. at 852 (quoting *Smith v. O'Grady*, 312 U.S. 329, 334, 61 S.Ct. 572, 574, 85 L.Ed. 859 (1941)). When the defendant is represented by counsel, he is presumed to be fully informed of the charges against him. *Id.*

This court has reviewed the state court record in the manslaughter case. The petitioner presented the entire state court file for that case. *See* Vol. 11, CP 4028–4100. Although Harris states that he was unaware of the nature of the charges and the law in relation to the facts of the case (*see* Vol. 9, CP 3110–11), he has not shown convincing evidence that he suffered any constitutional violations when the plea was accepted in state court. Therefore, there was no constitutional error.

## C. Washington's Rule of Evidence regarding admission of Prior Convictions

Harris contends that his due process rights pursuant to the Fifth and the Fourteenth Amendments were violated by the admission of his prior convictions. The Fifth Amendment states, in pertinent part, "No

person ... shall be deprived of life, liberty, or property, without due process of law." The Fourteenth Amendment, in pertinent part, states: "... nor shall any State deprive any person of life, liberty, or property, without due process of law."

■ Any proceeding in which evidence is allowed must be "trustworthy, reliable, and not unreasonably prejudicial." *State v. Bartholomew*, 101 Wash.2d at 640, 683 P.2d 1079 (citing ER 403). A document showing the prior conviction may be introduced into evidence pursuant to ER 803(a)(22). A prior conviction as evidence of aggravating factors in the penalty phase of a capital case may be admitted into evidence as long as it complies with the rules of evidence. *State v. Bartholomew*, 101 Wash.2d at 640–42, 683 P.2d 1079.

ER 102 states the purpose of the Rules of Evidence: "These rules shall be construed to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined." Evidence must be relevant, that is "having any tendency to make the existence of any fact that is of consequence to the determination the action more probable or less probable than it would be without the evidence." ER 401. Not all relevant evidence will be admitted, however. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." ER 403.

■ Consideration of the validity of a prior conviction based on a guilty plea should have been made in a pretrial hearing in the trial court. *See, e.g.,* CrR 4.5. The fact that such a pretrial hearing was not held in this case deprives any reviewing court of the benefit of determination of facts.

This matter is complicated by the subsequent vacation of the manslaughter conviction. On June 27, 1972, the trial court considered a request that Harris's plea of guilty

to manslaughter be withdrawn. After consideration of the report of the probation officer, the trial court "ordered that the defendant be permitted to withdraw the finding or pleas of 'Guilty' to the crime of manslaughter, and entered a plea of 'Not Guilty' herein." *See* Ex. A to Stip.Facts. The trial court further ordered "that the above-entitled cause be, and the same is hereby dismissed and the defendant is discharged from further attendance herein and is released from all penalties and disabilities resulting from the filing of said charge." *Id.* Therefore, at the time the conviction was placed before the jury in the penalty phase of the murder trial, the manslaughter charge had been dismissed! This fact was not placed in evidence.

There are some similarities between this case and the case of *Johnson v. Mississippi,* 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988). There, in the trial court, the prosecutor presented as his sole evidence of aggravating circumstances in the penalty phase of a capital case, a prior conviction of the defendant. 486 U.S. at 585, 108 S.Ct. at 1986. That prior conviction had been reversed by the Mississippi Supreme Court. The Supreme Court acknowledged that the sentencing jury's belief that the defendant had been convicted of a prior felony could have been decisive between a life sentence and a death sentence. *Id.* at 586, 108 S.Ct. at 1986–87. The court held that because the jury was allowed to consider "materially inaccurate" evidence, the defendant's Eighth Amendment right had been violated and the death sentence was reversed. *Id.* at 590, 108 S.Ct. at 1988–89.

Certainly, the legal effect of the 1972 dismissal should have been determined, or, at least, it should have been presented to the jury along with the judgment and sentence, to comply with the rules of evidence and due process. The record does not indicate that the legal effect of the dismissal was investigated by either defense counsel or the prosecutor. (This failure is also considered herein in Issue No. 1, *supra.*)

Additionally, there was no definition of manslaughter presented to the jury. In 1969, the elements of manslaughter were

the unintentional killing of a person without excuse or justification, by one committing an unlawful, but not a felonious act.... One may be convicted of manslaughter if he causes the death of another by doing some act in a negligent manner, and gross negligence is not necessary to be shown.

*State v. Sill,* 47 Wash.2d 647, 651, 289 P.2d 720 (1955) (citations omitted). The prosecutor in his closing argument, characterized the manslaughter conviction as follows: "I presented in my evidence the prior criminal convictions of Harris. Suffice to say that Harris has killed before. Turner was not the first." Vol. 2, VRP 815. Although Harris explained the circumstances of this charge in his direct testimony in the penalty phase, without instruction on the elements of manslaughter, the jury was very likely to come to the erroneous conclusion that any killing is murder. As a result, the jury was presented with only one part of the truth of Harris's criminal record of the prior conviction of manslaughter.

Harris's due process rights were violated because the evidence of his manslaughter conviction was admitted into evidence without pretrial consideration of the validity of the conviction or the effect of the later dismissal, and because the jury was presented with only part of the record pertaining to the conviction. Harris's due process rights in this regard were also violated in the appellate proceedings. As a result of this constitutional error, there was a substantial and injurious effect or influence on the jury's verdict.

***ISSUE NO. 3: Whether Washington's capital punishment statute is unconstitutional because it allows consideration of an unconstitutionally obtained prior conviction during the penalty phase.***

Harris argues that the Washington death penalty statute violates his due process rights because it allows the use of prior convictions, even though they would have been inadmissible during the guilt phase. Harris relied on his interpretation of *State v. Bartholomew,* 101 Wash.2d 631, 683 P.2d

1079 (1984) to support this contention. He reargues his claim that because his 1969 convictions were beyond the permissible 10 year period established in ER 609(b), they were inadmissible on that basis. Harris contends that because defense counsel did not have advance notice from the prosecutor that he intended to introduce the 1969 convictions, counsel had no opportunity to attack their validity or to present the dismissal of the manslaughter conviction.

The state continues to maintain that Harris's claim is meritless because he is unable to successfully show any constitutional defect in the manslaughter guilty plea proceedings. The state essentially relies on its arguments made regarding Issue No. 2, *supra.*

The Washington Supreme Court in *State v. Bartholomew, supra,* considered a constitutional attack on RCW 10.95.060(3). The court held that under due process, "the concept of fairness" requires that only reliable evidence, which meets the requirements of the rules of evidence, can be admitted in the penalty phase of a capital case. 101 Wash.2d at 640, 683 P.2d 1079. The court found that the portion of RCW 10.95.060(3) which states "evidence of the defendant's previous criminal activity regardless of whether the defendant has been charged or convicted as a result of such activity" to be offensive to state due process considerations. *Id.* at 641, 683 P.2d 1079. (The due process provisions of the Washington State Constitution are generally more liberally construed than the U.S. Constitution. *Id.* at 639, 683 P.2d 1079 (and cases cited therein).)

The ruling in *Bartholomew, supra,* essentially addresses Harris's third claim. His previous criminal activity included convictions for assault and manslaughter. For these reasons and those stated above in Issue No. 2, there is no constitutional error in the use of prior convictions.

### ISSUE NO. 4: Whether petitioner's incompetency prevented a fair trial.

■■■ Harris claims that he was not competent to stand trial. He alleges his due process rights were violated because the trial court failed to hold a competency hearing before his trial. He further contends that

the opinion of the evaluating team at Western State Hospital was inadequate because it was based on incomplete information. It was learned by counsel immediately before the commencement of the penalty phase that Dr. Mayers had failed to score one of Harris's tests. Harris cites numerous facts and information available to counsel before trial that were not discovered by counsel and were not presented to the trial court. Harris contends this information was directly relevant to the question of his competency. He argues that it would have demonstrated that he was not competent to stand trial.

The state disputes that there was any real evidence that Harris was incompetent. The state argues that the postconviction hearing on petitioner's motion for a new trial on raised this ground before the trial court. The testimony there, and the ruling of the trial court, demonstrates that the incomplete testing analysis had no impact on the experts' pretrial opinion regarding his competency. Without any other evidence to raise a suspicion that Harris was not fully competent, the state contends that trial court had no duty to hold a competency hearing.

The federal test for competency to stand trial is "whether the criminal defendant 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.'" *Drope v. Missouri,* 420 U.S. 162, 172, 95 S.Ct. 896, 904, 43 L.Ed.2d 103 (1975) (quoting *Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960). It is incumbent on the trial court to determine competency of a criminal defendant whenever a good faith doubt is entertained, or should be entertained. *Evans v. Raines,* 800 F.2d 884, 888 (9th Cir.1986) (citation omitted). The trial court must assess competency of the defendant, on the record and based on the in-court conduct of the defendant himself, and on the credibility and demeanor of both expert and fact witnesses. *Evans, id.* at 887. A trial court's failure to carry out this duty may leave irreparable damage. *Id.*

■ Although this question presents a mixed question of law and fact, the determination of competency to stand trial is one where the presumption of correctness applies. *Evans, id.; Miller v. Fenton,* 474 U.S. 104, 112–13, 106 S.Ct. 445, 451, 88 L.Ed.2d 405 (1985); *Maggio v. Fulford,* 462 U.S. 111, 117, 103 S.Ct. 2261, 2264, 76 L.Ed.2d 794 (1983). This determination may be overturned only if it is not "fairly supported by the record." 28 U.S.C. Sec. 2254(d)(8); *Maggio, id.* This is so because the trial court is

'[f]ace to face with living witnesses the original trier of the facts holds a position of advantage from which appellate judges are excluded. In doubtful cases the exercise of his power of observation often proves the most accurate methods of ascertaining the truth ... How can we say the judge is wrong? We never saw the witnesses ...'

*Maggio,* 462 U.S. at 118, 103 S.Ct. at 2264 (quoting *United States v. Oregon Medical Society,* 343 U.S. 326, 339, 72 S.Ct. 690, 698, 96 L.Ed. 978 (1952)).

It is undisputed that the trial court did not conduct a competency hearing. Certainly, in hindsight, it would have been better if the trial court had held such a hearing. *See Drope,* 420 U.S. at 177, 95 S.Ct. at 906. This issue is complicated by defense counsel's failure to request a competency hearing before either the guilt or penalty phase, and failure to follow up in his request for appointment of an independent expert to evaluate Harris. He also failed to present to the trial court and the evaluating team at Western State Hospital other available information regarding Harris's mental state, both before and after the date of the offense. *See* Stip.Facts Nos. 56–62.

The court has examined the state court record to determine what information was presented to the trial court regarding Harris's competency. The record indicates that the trial court first learned of the competency question from Harris's counsel. Vol. 3, CP 1133–41. The affidavit filed by counsel indicated communication problems with Harris, his refusal to heed counsel's direction to discontinue correspondence with police, court, prosecutors and witnesses; counsel's

concern that Harris did not fully comprehend the seriousness of the charges against him; and counsel's belief that Harris was unable to assist with his defense. Ex. 1 The trial court granted defendant's motion for mental examination. Vol. 3, CP 1145–46. Thereafter, the trial court received the letter opinion of the evaluating team at Western State Hospital, which stated that Harris was competent to stand trial. Vol. 3, CP 1158–59. The trial court did not indicate any unusual behavior by the defendant during any court appearances. Defense counsel sought and obtained a week's continuance to obtain an independent evaluation of Harris but Harris was not examined until after conviction and sentencing. Harris's counsel did not further raise the competency issue before trial. With this information before the court, it is not surprising that the judge apparently felt the issue of competency was closed.

The question of Harris's competency was first considered on its merits in the course of the motion for a new trial. Vol. 3, CP 1196–98. The trial court was advised for the first time that the pretrial evaluation and opinion was based on incomplete test data. An independent examiner, Dr. Allen Traywick was appointed to evaluate Harris and Dr. Mayers was order to reexamine him. Following a hearing on the motion for a new trial, the trial court entered findings of fact and conclusions of law. Vol. 4, CP 1662–67. The findings included that no psychological evidence was presented to the jury (F/F No. XI); that both Dr. Traywick and Dr. Mayers diagnosed Harris has having an antisocial personality with paranoid disorder (F/F No. XV); and that neither expert found any evidence of insanity, incompetency or that he acted under the influence of extreme mental disturbance at the time of the murder (F/F No. XVI).

In short, there were no obvious indications of incompetence within the knowledge of the trial court, either before or after trial, on which the court could base a good faith belief that Harris was incompetent. There is no support in the record for Harris's claim that his due process rights were violated by the trial court's failure to hold a competency hearing. There are, however, obvious ques-

tions of effective assistance of counsel. *See* Issue No. 1, Grounds A, B, C,. and D. If available information regarding Harris's mental health history and Harris's strange behavior following the murder had been made known to the trial court, there may have been a duty to hold a competency hearing. There was no constitutional error in failing to hold such a hearing, and Harris's incompetence at the time of trial has not been proved here.

### ISSUE NO. 5: Whether the state failed to disclose exculpatory evidence.

█ In petitioner's fifth ground for habeas corpus relief, Harris alleges that the prosecutor possessed exculpatory information which was not disclosed to defense counsel before trial. Specifically, he alleges the prosecutor knew that his evaluation at Western State Hospital before trial was based on incomplete test data. He contends that the prosecutor did not disclose this information until after the completion of the penalty phase. He further alleges that the prosecutor had other information obtained from his ex-wife regarding his delusional state beginning in 1967.

The state argues that this claim is meritless. The state claims that the petitioner's counsel was told before the penalty phase about the incomplete test data. The state disputes that the missing information had any exculpatory value. The state makes no response to Harris's allegations regarding the prosecutor's contact with his ex-wife.

The state's constitutional requirement to disclose exculpatory evidence originated in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The *Brady* decision requires that the state disclose "evidence that is both favorable to the accused and 'material either to guilt or to punishment.'" *United States v. Bagley,* 473 U.S. 667, 674, 105 S.Ct. 3375, 3379, 87 L.Ed.2d 481 (1985) (quoting *Brady,* 373 U.S. at 87, 83 S.Ct. at 1197). The requirement is based on the constitutional right to due process and to a fair trial. *United States v. Agurs,* 427 U.S. 97, 108, 96 S.Ct. 2392, 2399–2400, 49 L.Ed.2d 342 (1976).

Exculpatory evidence includes impeachment evidence, "so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." *United States v. Bagley,* 473 U.S. at 676, 105 S.Ct. at 3380. Material evidence is defined as

evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.

*Id.* at 682, 105 S.Ct. at 3383.

This issue was raised by Harris's counsel before the trial court. The state's position here is supported by an affidavit filed by the deputy prosecutor in response to these similar complaints. *See* Vol. 4, CP 1502–06. In that affidavit, the deputy prosecutor detailed the series of events: his first awareness of the uncompleted test scores, his communication of this information to defense counsel before the beginning of the penalty phase of the trial, and the fact that defense counsel did not seek a continuance in order to contact Dr. Mayers. *Id.* These statements were not disputed by defense counsel. Vol. 3, CP 1197–98.

Harris cannot convincingly establish that the state withheld this exculpatory evidence from him. Because of this conclusion, the court need not reach the question of whether that evidence was material.

Harris presented a summary of a conversation his investigator had with Harris's ex-wife, Linda Carson. *See* Sec. 3, Ex. C to Supplemental Exhibits to Petitioner's Motion to Expand the Record. In that summary, Ms. Carson is described as stating that she spoke with a prosecutor before Harris's trial and told him about Harris's instability and "craziness". She was never contacted again. Other than this reference, the court can find no other factual support for petitioner's contention. Again, discovery of this potentially exculpatory evidence was a responsibility of competent defense counsel. There was no constitutional error.

*ISSUE NO. 6: Whether Harris's constitutional rights were violated when his pretrial statement of October 22, 1984 was made and admitted at trial.*

Harris argues that his statement to police and prosecutors on the morning of October 22, 1984, the first day of trial, was involuntary. He contends that he did not knowingly and intelligently waive his Fifth Amendment right to remain silent when he gave the statement. He also contends that the statement was intended for plea negotiation and was therefore inadmissible under Washington's ER 410. Harris contends his Fifth, Sixth, and Fourteenth Amendment rights were violated.

The state responds by citing to the transcript of the statement. The state points out that the statement was given in the presence of, and on the advise of, counsel, that Harris was read his *Miranda* rights, that he affirmed that he understood them; and that he effectively waived those rights.

This issue will be discussed in two subparts: A) voluntariness of the statement; and B) plea negotiation.

## A. Voluntariness of the statement

■ When a defendant's inculpatory statement is used against him at trial, the state must prove that it is a

> product of a rational intellect and a free will. The test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne.

*U.S. v. Leon Guerrero,* 847 F.2d 1363, 1365 (9th Cir.1988) (citations omitted). Indications of involuntariness include situations where the statement is obtained "by any sort of threats of violence, [or] by any direct or implied promise, however slight, [or] by the exertion of any improper influence." *Id.* at 1366 (citations omitted). *See also Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). The record must demonstrate that the defendant's "will [was] overborne and his capacity for self-determina-

tion critically impaired." *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961); *Aiken v. Blodgett,* 921 F.2d 214 (9th Cir.1990).

To successfully show that a statement was given in response to some promise, the defendant must show that "[t]he promise [was] sufficiently compelling to overbear the suspect's will in light of all attendant circumstances." *Id.* (citations and footnote omitted). Totality of the circumstances includes, but is not limited to, "age, experience, education, background and intelligence". *Fare v. Michael C.,* 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979).

Here, Harris, before giving his statement, stated that he was giving the statement voluntarily, and waived his right to remain silent. Pl.Ex. 14 at 2. He further waived a CrR 3.5 hearing on the question of voluntariness after advice by counsel and the court of his right to do so. Vol. 2, VRP 564–69. Contrary to his arguments, an attorney may waive procedural matters, including a CrR 3.5 hearing on behalf of his client. A CrR 3.5 hearing is a procedural matter. *State v. Fanger,* 34 Wash.App. 635, 637, 663 P.2d 120 (1983).

The record is clear that Harris was acting in large part on the advice of counsel. Although Harris might argue that his free will was overborne by the poor advice of counsel or that he was not mentally competent, he is not able to meet the burden of demonstrating that the statement was given involuntarily. He can, however, collaterally attack the statement as part of his claim of ineffective assistance of counsel. *See* Issue No. 1, Ground E, *supra.* There is no constitutional error in this regard.

## B. Plea Negotiation

■ Washington's ER 410 states, in pertinent part:

> Except as otherwise provided in this rule, evidence ... of an offer to plead guilty or nolo contendere to the crime charged or any other crime, or of statements made in connection with, and relevant to, any of the foregoing pleas or offers, is not admissible

in any civil or criminal proceeding against the person who made the plea or offer. The primary exception to the rule is when the person who made the statement is later charged with perjury or making a false statement. This rule is substantially similar to Fed.R.Evid. 410; the differences being procedural, rather than substantive. *See* Washington Rules of Evidence, ER 410, Comment 410. The rule also includes statements made to a prosecuting attorney to induce a plea agreement. *State v. Jollo,* 38 Wash.App. 469, 473, 685 P.2d 669 (1984). *See also State v. Pizzuto,* 55 Wash.App. 421, 778 P.2d 42 (1989).

Generally, statements given in the course of plea discussions with a prosecutor are inadmissible pursuant to ER 410. *U.S. v. Leon Guerrero,* 847 F.2d 1363, 1367 (9th Cir.1988). Whether parties are in negotiation is a question of fact.

A statement was made in the course of plea discussions if: (1) the suspect exhibited an actual subjective expectation that the was negotiating a plea a the time of the discussion; and 2) the suspect's expectation was reasonable given the totality of the circumstances.

*Id.* (citations omitted).

The state court record and the record in this court is clear that the initial plan was to have Harris make this statement as part of a plea negotiation. In the evidentiary hearing here, counsel responded to the following question: "Q. ... Was Mr. Harris' conversation with the law enforcement authorities on October 22, 1984, a statement pursuant to plea discussions or plea negotiations with the prosecutor? A. Well, in my mind it was. In his [Harris] mind, I don't know.... In my mind, it was a negotiation-type statement." Evid.TR at 24. The trial court was concerned that the statement was part of plea negotiations:

The Court: Well, wasn't there an effort to plea bargain, yesterday?
[Counsel]: No. There was an offer—we offered to allow the State to have a statement from Harris on my representation that he would testify at this trial, and that if he did make that statement they would consider it for first degree murder. For reasons, that I cannot calculate, they rejected any negotiation after they heard the statement.

The court: Well, wasn't that an attempt at plea bargaining them that your client would plead guilty to first degree murder if the prosecutor would reduce the charge to first degree murder in exchange for his statement?

. . . . .

[Counsel]: —that's a conclusion. I really didn't intend it that way. Although I think what I was trying to short circuit was the 3.5 hearing....

Vol. 1, VRP 329–30. From these statements as well as others included herein, there is sufficient support in the record to conclude that Harris believed that was the purpose of the statement was plea negotiation. That was a reasonable conclusion in light of all circumstances. At minimum, the trial court should have conducted a hearing and made findings under *Guerrero,* and counsel should have requested such a hearing, and objected to the admissibility of the statement under ER 410.

Harris's due process right to a fair trial were violated because the question of whether the October 22, 1984 statement was given as part of a plea negotiation should have been raised before it was admitted into evidence. As a result of this constitutional error, there was a substantial and injurious effect or influence on the jury's verdict. *See* Issue No. 1, Ground F, *supra,* for further discussion of counsel's role in regard to this statement.

### ISSUE NO. 6a: Whether Harris properly waived his Fifth Amendment right to remain silent.

The parties do not raise this issue specifically. Harris gave up his Fifth Amendment right to remain silent when he testified at both the guilt and penalty phases of the trial. The trial record reflects that Harris was not advised of his constitutional rights by the court before he testified at trial, although he was advised of his rights before testifying at a pretrial hearing regarding admissibility of certain statements. There is no record of a

formal waiver of his right to remain silent when he testified at trial.

Generally, a waiver must be made with "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Brubine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1985); *U.S. v. Frank,* 956 F.2d 872 (9th Cir.1991). Waiver of a defendant's protection against self incrimination at one stage in a pretrial proceeding is not a waiver of that right at other stages. *United States v. Trejo–Zambrano,* 582 F.2d 460, 464 (9th Cir.1978) (and cases cited therein). The right to remain silent and not to incriminate oneself is a distinct right. For example, in a capital case, a defendant made incriminating statements during the course of a pretrial competency examination, and the statements were later used against him at trial. *Vandervilt v. Lynaugh,* 683 F.Supp. 1118, 1122–23 (E.D.Tex. 1988). Without a warning that his statements may be used at the penalty phase, the court found Fifth Amendment violations. *Id.* If a defendant is not fully informed that any statement he gives would be used as evidence to determine whether he would die, then he cannot be said to have knowingly and intelligently waived his right to self incrimination. *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981); *Vandervilt v. Lynaugh, supra.*

Waiver of a fundamental right cannot be assumed from a silent record. *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); *State v. Williams,* 87 Wash.2d 916, 921, 557 P.2d 1311 (1976). An attorney cannot waive a substantive right of his client, unless specifically authorized to do so. *State v. Dault,* 19 Wash.App. 709, 716, 578 P.2d 43 (1978). A defendant should not be bound by the decision of his attorney at a time when he did not fully understand his rights. *State v. Williams,* 87 Wash.2d 916, 921, 557 P.2d 1311 (1976) (citations omitted).

Nevertheless, Ninth Circuit law clearly indicates that the court is not required by the Constitution to make a *sua sponte* inquiry before a defendant testifies at trial. *United States v. Martinez,* 883 F.2d 750, 756–57 (9th Cir.1989) (citations omitted), *vacated on other grounds,* 928 F.2d 1470 (9th Cir.), *cert. denied,* 501 U.S. 1249, 111 S.Ct. 2886, 115 L.Ed.2d 1052 (1991). *See also United States v. Cuozzo,* 962 F.2d 945, 948 (9th Cir.1992); *United States v. Wagner,* 834 F.2d 1474, 1483 (9th Cir.1987). There was no constitutional error.

*ISSUE NO. 7: Whether Harris's Fifth Amendment right against self incrimination was violated by the admission, at trial, of statements made by Harris to police during the investigation.*

Harris argues that his Fifth Amendment right against self incrimination was violated when he was interrogated by police on July 2, 1984, July 17, 1984, and July 18, 1984. He contends that the police should have advised him of his *Miranda* rights before questioning him about his knowledge of the events pertaining to Turner's murder.

The state responds that these discussions could not be considered "interrogations" and that Harris was not "in custody" at the time he was questioned. The state points out that this court is bound by the facts found by the trial court following a CrR 3.5 hearing on these conversations. The state also argues that the conversations in large part were initiated by Harris, and the information given by Harris was done primarily on a volunteer basis, rather than in response to police questioning.

As argued by the state, the cautionary advice of rights is required by the *Miranda* decision when an individual is "in custody." *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Whether a person is in custody, is a objective question, that is, "how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984). *See also United States v. Curtis,* 568 F.2d 643, 646 (9th Cir.1978). The following factors are relevant: "the language used to summon the defendant, the physical surroundings, the extent to which the defendant is confronted with evidence of his guilt, and the pressure exerted to detain him." *United*

*States v. Crisco,* 725 F.2d 1228, 1231 (9th Cir.1984) (citations omitted).

Here, Harris does not present additional argument or evidence to support his claim. A review of the record does not demonstrate convincing evidence of errors of fact or law. Harris's collateral argument that his trial counsel was not present during the CrR 3.5 hearing is addressed in Issue No. 1, Ground C, *supra.* There is no constitutional error.

**ISSUE NO. 8: Whether the Prosecutor's decision to seek the death penalty denied Harris due process, equal protection of law, and was cruel and unusual punishment.**

Harris argues that the prosecutor filed the statutorily required notice of intent to seek the death penalty without making a determination that there were no mitigating circumstances to warrant leniency. As a result, Harris contends his Fifth, Eighth, and Fourteenth Amendment rights were violated.

The state argues that there is no precedent to support Harris's claim. The state cites authority that recognizes public policy gives broad prosecutorial discretion in making initial charge to seek the death penalty.

▉ Generally, the prosecutor has broad discretion in making the decision to seek the death penalty. The U.S. Supreme Court has not required prosecutors to explain these decisions.

> Our refusal to require that the prosecutor provide an explanation for his decisions in this case is completely consistent with this Court longstanding precedents that hold that a prosecutor need not explain this decisions unless the criminal defendant presents a prima facie case of unconstitutional conduct with respect to his case.

*McCleskey v. Kemp,* 481 U.S. 279, 296–97 n. 18, 107 S.Ct. 1756, 1769 n. 18, 95 L.Ed.2d 262 (1986) (citing *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) and *Wayte v. United States,* 470 U.S. 598, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985). The Supreme Court's statement is based on its general policy of protecting prosecutors from diversion of their attentions from their duty of enforcing the criminal law to explaining their charging decisions. *Id.*

In Washington, the decision to seek the death penalty is distinguished from determining the ultimate sentence. In the charging decision, "the prosecutor merely determines whether sufficient evidence exists to take the issue of mitigation to the jury. This type of discretion does not violate equal protection." *State v. Dictado,* 102 Wash.2d 277, 297–98, 687 P.2d 172 (1984). Thus, pursuant to RCW 10.95.040(1) the filing of a notice of intent to seek the death penalty is a prosecutorial statement that he does not know of sufficient mitigating circumstances to merit leniency. At the same time, the prosecutor is determining whether he has a strong enough belief that he can convince a jury of the same. *Id.* at 297, 687 P.2d 172.

The Washington Supreme Court found that the Pierce County Prosecutor will consider any mitigating circumstances brought to his attention before he files the notice of intent to seek the death penalty. *In re Harris,* 111 Wash.2d 691, 692–93, 763 P.2d 823 (1988). The court contrasted this policy with the policy outlawed in *State v. Pettitt,* 93 Wash.2d 288, 609 P.2d 1364 (1980) (automatic policy of filing habitual criminal charges against defendants with three or more felonies), or in *State v. Rowe,* 93 Wash.2d 277, 609 P.2d 1348 (1980) (standing policy of filing habitual criminal charges in cases of high profile and two prior convictions). The court recognized that there is a critical difference between the filing of an intent to seek death penalty and the decision to file habitual criminal charges. In seeking the death penalty, evidence of mitigation must be brought to the prosecutor by the defendant or his counsel. In a habitual criminal charge, the necessary elements are essentially public records. *In re Harris,* 111 Wash.2d at 693–94, 763 P.2d 823.

▉ Washington's statutory scheme for the initial decision to seek the death penalty has been sharply criticized: Lobsenz, James E., *Unbridled Prosecutorial Discretion and Standardless Death Penalty Policies: The Unconstitutionality of the Washington Capital Punishment Statutory Scheme,* 7 U.Pug.Sd.L.Rev. 299 (1984). One basis for

Lobsenz' criticism is that the prosecutor does not have to cite his reasons for filing the notice of intent. "The law thus requires less for a prosecutor to put a man on trial for his life than it does for an administrator to turn down a request for food stamps." *Id.* at 347. The merit of these arguments must be addressed to the Washington State Legislature and Washington courts. The scheme does not violate the federal Constitution.

Here, the record is clear that neither Harris nor his counsel presented mitigating circumstances to the prosecutor. Stip.Facts Nos. 7 and 8. Counsel explained that he had no time to explore the existence of mitigation, since he was appointed only four days before the notice of intent to seek the death penalty was filed and served. Evid.TR at 7–8. Counsel failed to make a record of this problem, although the co-defendant did. Vol. 3, CP 1202–06. Without a record, the court cannot review or make any findings of fact. Although the court believes the decision to seek the death penalty should be predicated on specific, articulated guidelines, there is no constitutional error. *See* Issue No. 1, Ground G, *supra,* for the discussion of counsel's role in the penalty decision.

***ISSUE NO. 9: Whether, during closing arguments in the penalty phase, the prosecutor committed error by attempting to minimize the jury's sense of responsibility for punishment.***

■ The petitioner argues that certain statements made by the prosecutor in his closing argument during the penalty phase violated petitioner's Eighth Amendment right. Those statements are as follows:

In making your decision, I want to distinguish, and *I think you should distinguish, between the responsibility for making your decision and the ultimate responsibility for punishment in the case.*
The ultimate responsibility in this case, the *ultimate responsibility of punishment, will not rest with you,* it will not rest with the Judge who signs the judgment and sentence, it will not rest with me for prosecuting the case, nor with Anderson for defending it, nor with the witnesses who

testified. *The ultimate punishment in this will be the responsibility, solely of Harris.*

Vol. 2, VRP 816 (emphasis by petitioner).

Harris contends that these statements attempted to minimize the jury's sense of responsibility for determining whether he was to receive a sentence of death. Relying on *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), Harris argues that the Eighth Amendment requires that a capital case be conducted with a high degree of reliability. He believes this reliability is in question because the jury may have believed that the burden of responsibility for sentencing lay elsewhere.

The state argues that if the prosecutor's remarks are examined in full, (*see* Vol. 2, VRP 815–17) petitioner's claim is meritless. According to the state, the statements do not fall with those prohibited in *Caldwell, supra,* and do not violate local law. The state contends that the claim should be dismissed.

A so-called *"Caldwell"* claim requires two characteristics. First, the claim must be based on statements "that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision" *Dugger v. Adams,* 489 U.S. 401, 407, 109 S.Ct. 1211, 1215, 103 L.Ed.2d 435 (1989). Second, the defendant raising the claim "necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Id. See Caldwell v. Mississippi,* 472 U.S. at 333, 105 S.Ct. at 2641–42.

The court has carefully reviewed the entire closing argument of the prosecutor during the penalty phase in light of these two requirements of a *"Caldwell"* claim, set forth above. The petitioner has not shown that the statements misled the jury on its role in the sentencing process. The statements sought to draw a distinction between the Harris's ultimate responsibility for his actions leading to the appropriate punishment which the jury was considering. The petitioner has not shown that this distinction is improper or violates local law. There is no constitutional error.

*ISSUE NO. 11: Whether the Washington State Supreme Court performed an inadequate proportionality review, thereby violating petitioner's due process rights.*

Washington has established a statutory requirement for a proportionality review of a death sentence by the Washington Supreme Court. *See* RCW 10.95.130. Harris argues that because there are no guidelines or procedures for carrying out this review, his due process rights were violated because he could not fully participate in this review.

Washington provides another separate procedure for review of capital cases, that is, direct review pursuant to RCW 2.06.030(b). The direct review is not at issue here.

The state maintains that this claim is not properly the subject of a *habeas* petition because it does not invoke a constitutional right. The state argues that petitioner does not have a constitutional right to a proportionality review of his death sentence. Further, the state contends that the Washington Supreme Court carried out its statutory duty in this case in *State v. Harris,* 106 Wash.2d at 798–800, 725 P.2d 975.

█ The state is correct that the federal Constitution does not require a proportionality review of a death sentence, although such reviews are applauded as "an additional safeguard against arbitrary or capricious sentencing" and as "a means to promote the evenhanded, rational and consistent imposition of death sentences under law." *Pulley v. Harris,* 465 U.S. 37, 45, 49, 104 S.Ct. 871, 878, 79 L.Ed.2d 29 (1984) (citations omitted). However, the state is incorrect in arguing that petitioner does not have a constitutional claim on this issue. When a state provides a right of review or appeal, the state must comply with the requirements of the Due Process Clause of the Fourteenth Amendment. *Evitts v. Lucey,* 469 U.S. 387, 401, 105 S.Ct. 830, 838–39, 83 L.Ed.2d 821 (1985) (and cases cited therein). The question presented by Harris's claim is whether Washington's sentence review procedure complied with the due process clause of the Fourteenth Amendment in this case.

In pertinent part, the Fourteenth Amendment states: "Section 1.... nor shall any State deprive any person of life, liberty, or property, without due process of law." The standard of due process has been described in various ways. Due process cannot be determined by a rigid formula.

Due process is not a mechanical instrument. It is not a yardstick. It is a process. It is a delicate process of adjustment inescapably involving the exercise of judgment by those whom the Constitution entrusted with the unfolding of the process.

*Joint Anti–Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 163, 71 S.Ct. 624, 644, 95 L.Ed. 817 (1951) (concurring opinion). The court begins "with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972) (quoting *Cafeteria & Restaurant Workers Union v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748–49, 6 L.Ed.2d 1230 (1961)). In sum, due process must be "meaningful," *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965), and "appropriate to the nature of the case," *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). What process is due depends on the particular situation. In a recognition of death as an unusually severe punishment, the U.S. Supreme Court has required a heightened degree of scrutiny of procedural due process before the deliberate extinguishment of human life. *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

With these general principles in mind, we turn our attention to determining the standard of due process in death sentence review proceedings. Because the U.S. Supreme Court has not specifically addressed this question, the court must review other situations where the general standard of due process has been applied to specific situations. Following are some examples: In the *Morrissey* case, due process minimally required the following procedures before revoking a

parole: 1) written notice of the claimed parole violation; 2) disclosure to the parolee of the evidence against him; 3) the opportunity to be heard in person and to present witnesses and documentary evidence; 4) the right to confront and cross-examine adverse witnesses, with certain exceptions; 5) a neutral and detached hearing body; 6) a written decision including the reasons and evidence on which the decision was based. 408 U.S. at 488–89, 92 S.Ct. at 2603–04. In the *Evitts* case, due process guaranteed a criminal defendant the effective assistance of counsel to process a first appeal, if that appeal was determined to be an appeal of right. 469 U.S. at 402, 105 S.Ct. at 839. Before a state seeks to suspend a license to drive a vehicle, due process requires notice and an opportunity for hearing. *Bell v. Burson,* 402 U.S. 535, 542, 91 S.Ct. 1586, 1591, 29 L.Ed.2d 90 (1971). Before terminating welfare benefits, a recipient must receive timely and adequate notice, detailing the reasons for the proposed termination, and an oral hearing to confront adverse witnesses and present arguments and evidence. *Goldberg v. Kelly,* 397 U.S. 254, 267–68, 90 S.Ct. 1011, 1020–21, 25 L.Ed.2d 287 (1970).

▇▇ From these examples, two essential—and minimal—components to procedural due process are evident. When an individual has a constitutionally protected interest at risk of loss, due process requires first, that he have timely notice of the proceedings *that is appropriate to the case* and provides the ability to discover the reasons for the risk of loss, and second, a *meaningful* opportunity to argue the strengths of his position and to attack the position of the party who seeks to deprive the individual of his interest.

Applying these principles of due process to Harris's claim, the court must determine if there is a constitutionally protected private interest at risk. Here, that protected interest is Harris's life, which has been judicially determined to be terminated. The court then must determine the nature of the government function involved. In Washington, the governmental (or public) interest is to conduct a comparative sentence review to ensure that the death sentence is not excessive or disproportionate to the penalties imposed in similar cases. RCW 10.95.130(2).

Next, the court must determine if Harris had appropriate and timely notice and a meaningful opportunity to be heard. Certainly, Harris has had notice that he may lose his life. He also had notice that the Washington State Legislature has mandated that the Washington Supreme Court carry out a sentence review to compare his sentence with similar cases in order to ascertain whether his sentence is appropriate and lawful. The question, then, is whether Harris had a *meaningful* notice, *appropriate to the case,* of the *procedure* to be followed, and whether that procedure provided a *meaningful* opportunity to be heard; that is, to argue the strengths of his position and to address opposing views in the sentence review proceeding.

Washington's death sentence review is established in RCW 10.95.100. The procedure is set forth in RCW 10.95.130(1):

> The sentence review required by RCW 10.95.100 shall be in addition to any appeal. The sentence review and an appeal shall be consolidated for consideration. The defendant and the prosecuting attorney may submit briefs within the time prescribed by the court and present oral argument to the court.

This statute sets out three questions which the Washington Supreme Court must address in its review. These questions are

> (a) whether there was sufficient evidence to justify the affirmative finding [of no sufficient mitigating circumstances to merit leniency] ...; and

> (b) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant ...; and

> (c) whether the sentence of death was brought about through passion or prejudice.

RCW 10.95.130(2)(a), (b), (c). On completion of the review, RCW 10.95.140 mandates the next procedural step to be taken, depending on the result of the review: affirmance or reversal. This court has not found any specific rules of procedure which govern this

**1288**

sentence review. There are Rules of Appellate Procedure for the direct review. *See* RAP 4.2, *et seq.*

This court will not address due process considerations relating to the first and third issues in the sentence review (RCW 10.95.-130(2)(a) and (c)). Harris does not claim any constitutional violation pertaining to them. The court will focus on due process on the second question (RCW 10.95.130(2)(b)), which is commonly referred to as the "proportionality review".

RCW 10.95.130(2)(b) requires the Washington Supreme Court to determine whether the sentence is excessive or disproportionate when compared to similar cases. The cases from which this comparison takes place are those

> reported in the Washington Reports or Washington Appellate Reports since January 1, 1965, in which the judge or jury considered the imposition of capital punishment regardless of whether it was imposed or executed, [first category] and cases in which reports have been filed with the supreme court under RCW 10.95.120 [convictions of aggravated first degree murder, second category].

RCW 10.95.130(2)(b). This section requires the court to conduct a comparative review, as opposed to a traditional review. RCW 10.-95.130(2)(b). A comparative review is one in which the court reviews the defendant and the sentence in relation to similar defendants in similar cases. *Pulley v. Harris,* 465 U.S. at 43, 104 S.Ct. at 875–76. In contrast, a traditional review is one where the court decides whether the punishment is justified by the crime committed. *Id.* at 42–43, 104 S.Ct. at 875–76. This distinction is important in examining the sentence review procedure in this case.

RCW 10.95.130 does not establish adequate standards or guidelines on which the Court or the parties can rely. The Washington Supreme Court has stated that the proportionality review statute "provides little guidance" and "is unclear". *See, e.g., State v. Harris,* 106 Wash.2d at 798–99, 725 P.2d 975; *State v. Jeffries,* 105 Wash.2d 398, 431, 717 P.2d 722 (1986); *State v. Campbell,* 103 Wash.2d 1, 42, 691 P.2d 929 (1984) (Ut-

ter, J. dissenting). *See also* W. Ward Morrison, Jr., Comment, *Washington's Comparative Proportionality Review: Toward Effective Appellate Review of Death Penalty Cases Under the Washington State Constitution,* 64 Wash.L.Rev. 111 (1989) (hereinafter referred to as *"Comparative Proportionality Review"*) (concluding that the proportionality review violates Washington State Constitution, Art. I, Sec. 14). In *State v. Campbell,* the Washington Supreme Court said, "A more definitive proportionality review will await another day when this court will be confronted with a capital case with far fewer and less severe aggravating factors." *State v. Campbell,* 103 Wash.2d at 30, 691 P.2d 929. This definitive proportionality review has not occurred.

Because of the lack of guidance on procedures, several problems are presented:

> *First,* although the statute specifies where to find similar cases, the statute does not define a "similar case." It is difficult to ascertain which cases should be included in the review of a particular sentence. The result may be skewed, depending on the cases used. The problem created by the lack of standards can be clearly seen in the *Harris* decision. The majority states that there are no similar cases because they cannot find any cases where the death penalty was considered for a solicited killing under the first statutory category in RCW 10.95.130(2)(b). *Harris,* 106 Wash.2d at 798, 725 P.2d 975. On the other hand, the majority cites to three cases which fall within the second statutory category in RCW 10.95.130(2)(b). *Id.* at 798, 725 P.2d 975. Shouldn't the three cases in the second category be compared as "similar cases" under RCW 10.95.-130(2)(b)? The thrust of the statute seems to require the court to compare death penalty cases with cases where the death penalty could have been, but was not, requested. The dissent finds three more cases. One is left with questions: Are there similar cases or not? What is a similar case? For purposes of this discussion, those questions need not be answered by this court.

Neither the state legislature nor the State Supreme Court has determined what should be considered in determining "similar cases, considering both the crime and the defendant." RCW 10.95.130(2)(b). What about age? Race? Sex? Pregnancy? (In *State v. Edmondson*, Kitsap Co. 82–1–00244–3 (March 22, 1983), a "similar case," the defendant was a pregnant female. Although the death penalty was not requested, the facts of the case were arguably much more heinous than Harris's.) Disability? Mental Status? Diminished capacity? Emotional Status? Competence of counsel? Delay in prosecution? Motive? Acquittals of co-defendants? Can the Supreme Court go outside the confines of RCW 10.95.130(2)(b) to find "similar cases"? What about cases from other jurisdictions? What about similar crimes where aggravation was not charged? Similar first degree murder cases where aggravation could have been, but was not charged? Not guilty verdicts in aggravated and first degree murder cases where death was not requested and no reports were filed? There may be many "similar cases" not covered in the state's proportionality review.

*Second,* although the parties may submit briefs and present oral argument, there is no procedure for the parties to be notified of which cases, or types of cases, the court may consider similar, until the parties receive the court's ultimate determination. Even at that point, the parties learn only of those cases the court chooses to cite in its decision. Again, we see this problem illustrated in the *Harris* decision. The dissent not only finds three cases which the majority does not address, but the majority and the dissent compare the cases in entirely different ways. Opposite conclusions resulted. Additional approaches are found in the briefs of the parties. *See* Vol. 6, CP 1984–86 and 2089–91.

*Third,* when no similar cases can be found, the statute does not give an alternative procedure. *Comparative Proportionality Review,* at 120–21. This problem is well illustrated by the instant case. As noted by the Washington Supreme Court, in 1984 there were no reported cases which

considered the imposition of the death penalty for a solicited killing. The court said that, "Therefore, there is no evidence to be considered whether the present case is disproportionate to previous cases." *Harris,* 106 Wash.2d at 798, 725 P.2d 975. Possibly, as suggested in *Comparative Proportionality Review,* at 124 n. 82, the court was precluded from fulfilling its statutory duties. Certainly, the court is without legislative guidance.

*Fourth,* the statute does not give any standard for reviewing the selected cases. *Comparative Proportionality Review,* at 121. Again, this problem is clearly seen in this case. After noting the lack of cases wherein the death penalty was considered, the majority cited three murder cases which involved solicitation as an aggravating factor. Rather than taking a factual comparison approach, the majority focused on the fact that the death penalty was not sought in those cases and highlighted the opinion of a trial court in one case. There, the trial court opined that if the prosecutor had sought the death penalty, he would likely have been successful. *Harris,* 106 Wash.2d at 799, 725 P.2d 975. Why should the death penalty be sought for Harris but not in that case? Shouldn't those cases be compared? (*State v. Manthie,* Kitsap County cause 82–1–00003–3 (Dec. 6, 1983).) After pointing out that Harris was found to have solicited Bonds for Turner's murder, and then committed the murder with Bonds, the majority essentially ended its comparison of similar cases. *Id.* At best, this analysis appears superficial and incomplete. The penalty sought is not the only component of a "similar case." The fact that the defendant was convicted of aggravated first degree murder is also a component of a "similar case." RCW 10.-95.130(2)(b).

The majority's comparison of the Harris sentence to other murder cases involving a solicited murder is very brief. The court simply concluded that "[w]e are satisfied the imposition of the death penalty was not 'wantonly or freakishly' imposed." *Harris,* 106 Wash.2d at 799, 725 P.2d 975. The reasons cited included the following: no

errors in the guilt or sentencing phases of the trial; the trial court's successful efforts to ensure a fair trial; the existence of a prior conviction for manslaughter; Harris killed Turner as the first of a list of persons he intended to kill; and Harris's decision not to present psychological information as mitigation. *Id.* Only one of these reasons is related to a comparison of a similar defendant in a similar case; that is, that other defendants did not have as serious a prior record as Harris. (This court notes the possibility that this section was also intended to address the first and third aspect of the sentence review in RCW 10.95.130(2) but the decision is not specific.)

Unfortunately, several of the reasons cited by the majority are based on counsel's errors and are of questionable accuracy. For example, because of counsel's errors, the sentencing jury and the majority were not aware that the prior 1969 manslaughter conviction was vacated in 1972. The statement regarding the list of people that Harris intended to kill was presented without objection or substantiation in the guilt phase, was not argued by the prosecutor as a factor warranting death in the penalty phase, and had dubious validity given Harris's delusional mental condition at the time the statements were made. It was evidence in the case but not a finding by the jury. Harris's version of his participation in the killing of Turner had questionable forensic validity, and may have been inadmissible because of his Fifth Amendment right against self incrimination and/or as plea negotiations. *See* Issue No. 7, *supra.* The majority's conclusion that the guilt and penalty phases were error free is erroneous itself, as discussed herein. Finally, the absence of mitigation evidence at the penalty phase was not a calculated trial strategy, but rather the result of ineffective assistance of counsel. *See* Issue No. 1, Ground 13, *supra.*

The dissent in *Harris* goes into detail, comparing what it determines to be similar defendants and similar crimes. *Harris,* 106 Wash.2d at 803–06, 725 P.2d 975. For example, the dissent describes the "grisly" murders in *State v. Manthie,* Kitsap County cause 82–1–00003–3 (Dec. 6, 1983); *State v. Edmondson,* Kitsap County cause 82–1–00244–3 (Mar. 22, 1983); and *State v. Mitchell,* King County cause 83–1–02643–8 (Apr. 23, 1984), compares them to the facts of the Harris murder and finds significant and critical differences. The dissent cites the lack of clear evidence of a true motive, serious questions as to the existence of a contract, which was the aggravating circumstance, the acquittal of Harris's codefendant, the inherent unreliability of the state's key witness, and the passage of time since Harris's last conviction as compared to other defendants. *Id.* After this analysis, the dissent concludes that "Harris has been capriciously selected to die." *Id.* at 802, 725 P.2d 975.

The Washington court did not carry out its statutory mandate in *Harris.* The majority decision can be characterized as a traditional review, rather than a comparative review. *Comparative Proportionality Review,* at 123–24 n. 81.

*Fifth,* no procedure is established for fact finding as part of the sentence review. Some of the majority's statements amounts to findings of fact. Findings of fact are not contained within the trial record. Generally, an appellate court is prohibited from engaging in factfinding where the trial court has not done so. *State v. Marchand,* 62 Wash.2d 767, 770, 384 P.2d 865 (1963) (and cases cited therein). It is anyone's guess whether the Report of the Trial Judge under RCW 10.95.120 is intended to be findings of fact.

This is not a question of whether this judge agrees with the majority or the minority in *Harris, supra,* or whether there was an error in the application of state law. Rather, it is a question of whether Harris' liberty interests, protected by the Due Process Clause of the Fourteenth Amendment, were violated by the Washington proceedings.

It is well settled law that "federal habeas corpus relief does not lie for errors of state law." *Campbell v. Blodgett,* 997 F.2d 512, 522 (9th Cir.1992) (and cases cited therein). Accordingly, an allegation of a " 'failure on the part of the Washington Supreme Court

to fulfill its statutory mandate' is not cognizable in federal habeas proceedings." *Id.*

In *Campbell v. Blodgett, supra,* petitioner claimed that the Washington Supreme Court failed to conduct a constitutionally inadequate review of his sentence, focusing on the "passion or prejudice" aspect in RCW 10.95.130(2)(c). After considering the court's conclusion in light of its entire review, the Ninth Circuit found "the court's review sufficient to fulfill its essential function of ensuring the 'evenhanded, rational, and consistent imposition of death sentences under law.' " 997 F.2d at 522, fn. 12 (citations omitted).

Although there is little authority on the constitutionality of Washington's statutory sentence review, other courts have addressed similar issues. None are sufficiently close to *Harris, supra,* on either facts or issues decided, to offer much guidance. For example, in *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), the U.S. Supreme Court upheld the Arizona State Supreme Court's proportionality review on the basis that the court's definitions of "especially cruel" and "depraved" were adequate. In *McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), the U.S. Supreme Court held that reliance on statistics to show racial bias in Georgia's capital sentencing was not violative of the 8th or 14th Amendments. In *Peterson v. Murray,* 904 F.2d 882 (4th Cir.1990), the Eleventh Circuit rejected petitioner's assertion that Virginia Supreme Court's sentence review did not discuss each and every capital murder case. In *Moore v. Balkcom,* 716 F.2d 1511, 1518 (11th Cir.1983), the Eleventh Circuit found that the district court erred by conducting its own proportionality review. In *Tucker v. Zant,* 724 F.2d 882, 896 (11th Cir.1984), the Eleventh Circuit concluded that the record reflected that petitioner had access to cases used in proportionality review as well as a long history of state supreme court's sentencing reviews.

Here, on careful consideration of the entire sentence review in *Harris, supra,* it is clear that the Washington Supreme Court did not fulfill the essential function of ensuring the "evenhanded, rational, and consistent imposition of death sentences" under Washington

law. *Campbell v. Blodgett,* 997 F.2d at 522, n. 12 (citations omitted). Harris' due process rights were violated in the sentence review. While he had notice of the *proceedings,* he did not have adequate, meaningful, notice of the *procedure* to be followed. Considering the heightened degree of scrutiny of procedure due process required under *Furman, supra,* the procedural notice available was not appropriate to the nature of the case.

Harris had no adequate notice of what "similar cases" are, how they are to be selected, or the factors to be compared. He had no notice of what would happen if no "similar cases" were found. He had no adequate notice of the court's standard for review of "similar cases." He had no notice that he could, or could not, urge that the Supreme Court consider cases as similar that are not listed in RCW 10.95.130(2)(b). He had no notice that the Supreme Court would adopt the trial judge's report as findings of fact. Because of the lack of appropriate notice regarding the procedure to be followed, Harris did not have a meaningful opportunity to be heard. Among other disabilities, he had no way of discovering or countering the Supreme Court's positions on "similar cases" taken for the first time in its decision.

It is necessary to due process that all participants in the sentence review operate under the same rules so that the noble purpose of a sentence review will be reliably and constitutionally carried out.

Harris's due process rights were violated by a failure of procedural due process in the proportionality review. The error had a substantial and injurious effect or influence in the result.

*ISSUE NO. 16: Whether there is any constitutional infirmity resulting from the disparity of Harris's death sentence and his co-defendant's acquittal.*

 Harris argues that because Bonds, his co-defendant, was acquitted, his case amounts to an arbitrary and capricious action of the unchecked discretion of the prosecutor.

The state responds that Harris has no constitutional right to receive the same or similar sentence as a co-defendant.

The state's argument has merit. *See generally Brogdon v. Blackburn,* 790 F.2d 1164 (5th Cir.1986). Disparity of results is better addressed as part of the sentence review issue. *See* Issue No. 11, *supra.* Harris does not show convincing evidence of a constitutional violation by his co-defendant's acquittal. There is no constitutional error.

***ISSUE NO. 17: Whether the inconsistent verdicts are unconstitutional.***

 Harris argues that because he and Bonds, his co-defendant, received different results at trial, his due process and equal protection rights have been violated. He does not present any specific authority for his position.

The state contends that Harris's claim is meritless. Based on case law, the state argues that the only conclusion one can come to when considering the different verdicts is that two juries came to two different results.

The state's basic position is correct. *See United States v. Powell,* 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984); *Harris v. Rivera,* 454 U.S. 339, 102 S.Ct. 460, 70 L.Ed.2d 530 (1981). Harris has not shown that his constitutional rights were violated because of inconsistent verdicts alone. There is no constitutional error.

***ISSUE NO. 18: Whether Instructions No. 2 and 5, given during the penalty phase, erroneously encouraged the jury to reach a unanimous verdict on all issues.***

 Harris contends that Jury Instructions 2 and 5, given by the trial court without objection by trial counsel, impermissibly encouraged jurors to unanimously reach a verdict on all issues presented to them in the sentencing phase. Harris relies on *Mak v. Blodgett,* 970 F.2d 614 (9th Cir.1992) and the authorities cited therein to support his contention.

The entire text of Instruction No. 2 is found at Vol. 3, CP 1185–86 and at Vol. 2,

VRP 811–12. The part of that instruction attacked by Harris is as follows:

The question you are required to answer is as follows:

Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?

If you unanimously answer 'yes' the sentence will be death. If you unanimously answer 'no' or if you are unable to agree on a unanimous answer the sentence will be life imprisonment without possibility for parole.

The entire text of Instruction No. 5 is found at Vol. 3, CP 1189 and Vol. 2, VRP 813–14. The part of the instruction attacked by Harris is as follows:

You must answer one question: All 12 of you must agree before you answer a question 'yes' or 'no'. When all of you have agreed, fill in the answer to the question in the verdict form to express your decision. When you have filled in the answer called for by the verdict form, the foreman will sign it and notify the bailiff who will conduct you into the court to declare your verdict.

Neither counsel for the state nor counsel for the defendant objected to these instructions. Vol. 2, VRP 808. Instruction No. 2 is identical in wording to portions of Instruction No. 3 in the *Mak,* decision. 970 F.2d at 624. Instruction No. 5 is identical in wording to portions of Instruction No. 6 in the *Mak,* decision. *Id.*

Washington law states that when a defendant is found guilty of aggravated murder in the first degree, the sentence is life imprisonment without the possibility of release or parole. RCW 10.95.030(1). This sentence is a "presumptive sentence [that] can *only* be overcome by a unanimous verdict that 'there are not sufficient mitigating circumstances to merit leniency.'" *Mak, id.* at 624 (emphasis in original) (citing RCW 10.95.060(4)). The jury considers this question following a special sentencing proceeding held pursuant to RCW 10.95.050 and .060.

As stated in *Mills v. Maryland*, 486 U.S. 367, 376, 108 S.Ct. 1860, 1866, 100 L.Ed.2d 384 (1988) and relied on by the Ninth Circuit in *Mak*, a reviewing court examines a jury instruction from the standpoint of the underlying law and what a reasonable juror would understand the instruction meant. "The Supreme Court has held that, where the underlying statute does not require unanimity, due process will not tolerate instructions that could reasonably be interpreted by a jury to preclude consideration of any mitigating factor unless such factor was unanimously found to exist.... As in *Mills*, '[u]nless we can rule out the substantial possibility that the jury may have rested its verdict on the 'improper' ground, we must remand for resentencing.'" *Mak*, 970 F.2d at 625 (quoting *Mills v. Maryland*, 486 U.S. at 377, 108 S.Ct. at 1866 (citations omitted)). The Supreme Court noted that the decision to execute a defendant is so unique that "[e]volving standards of societal decency have imposed a correspondingly high requirement" to ensure that the decision is the appropriate one in a specific case. *Mills*, 486 U.S. at 383–84, 108 S.Ct. at 1869–70. *See also Kordenbrock v. Scroggy*, 919 F.2d 1091 (6th Cir.1990), *cert. denied*, 499 U.S. 970, 113 L.Ed.2d 669 (1991).

Unanimity of a jury finding that there are no mitigating circumstances is required by Washington law. Any one juror could find a mitigating circumstance and prevent the death penalty. RCW 10.95.030(1); RCW 10.95.060(4). The Ninth Circuit held that Instruction No. 6 in *Mak* misstated Washington law by instructing that all jurors must agree before they could answer "no" to the question regarding mitigating circumstances. *Id.* at 624–25. The Ninth Circuit noted that if this error was the only error in the sentencing phase, then it might be "tolerable". *Id.* As in this case, this error is not the only error, and it cannot be said to be tolerable. Since the instructions at issue here are identical, the same result is required.

Harris's due process rights were violated by these erroneous jury instructions. As a result of this constitutional error, there was substantial and injurious effect or influence in determining the jury's verdict in the penalty phase of the trial.

## ISSUE NO. 19: Whether death by hanging is unconstitutional as cruel and unusual punishment.

▮ Petitioner contends that scientific evidence demonstrates that death by hanging is a slow, lingering, and painful process. The state argues that hanging is not *per se* unconstitutional, because there is no evidence that hanging causes unnecessary and wanton pain.

At this time in the legal history of the U.S. Court of Appeals for the Ninth Circuit, this issue has been laid to rest in the state's favor. *Campbell v. Wood*, 18 F.3d 662 (9th Cir.1994). No constitutional error has been shown.

## ISSUE NO. 20: Whether the requirement that petitioner choose between methods of execution is unconstitutional as cruel and unusual punishment.

▮ Although he does not discuss this claim separately or in detail, petitioner contends that choosing between methods of execution is also cruel and unusual punishment.

In response to Harris's contention that a choice of execution methods is unconstitutional, the state argues that the choice was enacted by the Washington legislature. As such, the state contends that it is presumed to be valid and should not be disturbed without a finding that it violates the Eighth Amendment.

RCW 10.95.180(1) provides for an election, by the defendant, of death by hanging by the neck or intravenous injection of a substance in a quantity to cause death. Petitioner has not met the "heavy burden" to successfully attack this legislative pronouncement of a capital punishment. *Gregg v. Georgia*, 428 U.S. 153, 176, 96 S.Ct. 2909, 2926–27, 49 L.Ed.2d 859 (1976); *Campbell v. Blodgett*, 978 F.2d 1519, 1518 (9th Cir.1992) (and cases cited therein). There is no constitutional error.

## CONCLUSION

Federal constitutional errors were committed as stated above in Issues 1, 2, 6, 11, and

18. Because of the substantial and injurious effect or influence of these errors on the jury's verdicts, justice and law requires the extraordinary remedy of granting Harris's petition for a writ of habeas corpus.

Therefore, it is hereby

**ORDERED** that Benjamin J. Harris, III's Petition for a Writ of Habeas Corpus is **GRANTED.** His state court conviction of aggravated first degree murder and his sentence of death should be vacated and set aside; and orders regarding further state proceedings shall be set as part of the Writ.

### APPENDIX A

In the United States District Court for the Western District of Washington at Tacoma

Benjamin J. Harris, III, by and, through Judith H. Ramseyer, Guardian *ad litem*, Petitioner,

v.

James Blodgett, Superintendent Washington State Penitentiary, Respondent.

C89–307TB

Stipulation of Facts and Documents

[Filed Nov. 3, 1993]

Honorable Robert J. Bryan

### I. STIPULATED FACTS

The following facts are stipulated to by the parties:

1. On July 27, 1984, Gregory Bonds was charged with murder in the first degree.

2. On August 10, 1984, the information was amended and Benjamin J. Harris, III, was added as a defendant.

3. On August 13, 1984, Murray J. Anderson filed a notice of appearance on behalf of Mr. Harris.

4. On August 15, 1984, Mr. Anderson was appointed by Pierce County to represent Mr. Harris on the amended information charging him with murder in the first degree and aggravated murder.

5. Thomas Haist, an attorney, assisted Mr. Anderson with the trial of Mr. Harris's case. Mr. Haist had been out of law school for only two years and had never defended a felony charge. Mr. Anderson was lead counsel and made the decisions on defense strategy.

6. On August 16, 1984, the prosecuting attorney for Pierce County filed notice of special sentencing requesting that, if Mr. Harris was convicted of aggravated murder, he be given the death sentence.

7. Mr. Anderson did not contact the Pierce County Prosecuting Attorney's Office to present any mitigating circumstances to them prior to filing of the notice.

8. Neither the prosecutor nor the defendant moved to extend the time in which special notice could be filed.

9. Mr. Anderson consulted with no expert witnesses, other than Drs. Traywick and Mayers, to assist him in deciding whether the facts and circumstances of the case warranted the presentation of an insanity defense, diminished capacity defense, and/or a hearing on Mr. Harris's competence.

10. Mr. Harris told Mr. Anderson that Judge Tanner of the United States District Court was his half-brother.

11. Mr. Anderson did not ask any expert witness to prepare a social history evaluation of Mr. Harris so that this evaluation could be considered and presented to the jury at the time of the sentencing hearing.

12. Mr. Anderson did not retain an investigator or ask the Court to appoint an investigator to assist in interviewing witnesses, in presenting Mr. Harris's defense, or in representing Mr. Harris at a special sentencing hearing.

13. Mr. Anderson had represented both Mr. Harris and Mr. Harris's family members since the early 1960s on.

14. In May 1968, Mr. Anderson represented Mr. Harris against charges of resisting arrest, having no valid operator's license, and reckless driving in Pierce County Cause 36970. During the course of this case, Mr. Anderson filed a motion and an affidavit for a continuance indicating that Mr. Harris had

emotional turmoil and was unable to present to his attorney salient facts necessary to his defense.

15. In 1968, Mr. Anderson's then law partner, Quimby R. Bingham, represented Mr. Harris's wife, Linda Marlene Harris, in a dissolution action where Mr. Harris was a respondent.

16. While these dissolution proceedings were pending, Mr. Harris was charged with second degree assault on May 16, 1969, under Pierce County Cause 38189. Linda Marlene Harris was the victim. Mr. Anderson represented Mr. Harris on this charge.

17. In 1968, Mr. Harris was charged with murder in the second degree in Pierce County Cause 38314, and was represented by Mr. Anderson. He entered a plea to a reduced charge of manslaughter on 12/29/69.

18. On June 27, 1972, the Honorable Bartlett Rummel entered an order in Pierce County Cause 38314 permitting Mr. Harris to withdraw the plea of guilty to the crime of manslaughter and enter a plea of not guilty, and further ordering that the case be dismissed and the defendant discharged from any further attendance and released from all penalties and disabilities resulting from the filing of the charge.

19. A copy of the order dismissing the charge was contained in the Superior Court files of the State of Washington for Pierce County and was in that file during all times that Mr. Anderson represented Benjamin J. Harris in Pierce County Cause 84–1–01190–6.

20. Bessie M. Robinson Lawrence was Mr. Harris's mother. On December 10, 1983, she died intestate.

21. Abel Lawrence was married to Bessie M. Robinson Lawrence on the date that she died.

22. On January 12, 1984, Mr. Anderson filed legal pleadings on behalf of the estate of Bessie M. Robinson Lawrence under Pierce County Cause 84–4–00052–2, representing Abel Lawrence who was the administrator of the estate.

23. Mr. Harris was listed in case 84–4–00052–2 as an heir of Bessie M. Robinson Lawrence and a person who was entitled to $\frac{1}{14}$ of her separate estate.

24. Prior to the trial, Mr. Harris told others that he was being charged with aggravated murder because of, among other things, a conspiracy between those persons who were named as heirs to his mother's estate. Included as a co-conspirator was Abel Lawrence, the administrator of the estate.

25. Mr. Anderson was aware of Mr. Harris's stated beliefs that the murder charges against him were the result of a conspiracy between the heirs, including Abel Lawrence.

26. Information provided to the Tacoma Police Department by the Harris family suggested that they believed that on or about 12/7/83, Mr. Harris shot at his step-father, Abel Lawrence. Mr. Anderson was aware of the beliefs of the family that Mr. Harris had attempted to shoot at Mr. Lawrence.

27. Prior to the Turner homicide, Sgt. Parkhurst of the Tacoma Police Department had received calls from Mr. Harris on a regular basis for at least one month.

28. The police reports make numerous references to conversations between Sgt. Parkhurst and Mr. Harris regarding his concerns about vandalism to his car and attempts on his life, allegedly stemming from family problems due to a missing will and the inheritance from his mother's estate.

29. On June 14, 1984, the day of the homicide, Mr. Harris called the investigating police officers and advised them that he had heard rumors that he was being named as a person involved. He asked whether they had heard the rumors. Mr. Harris volunteered to help the police in their investigation of the murder. He indicated that he would contact jail inmates for the Tacoma Police Department.

30. The prosecuting attorney's reports reveal that at the time of Mr. Harris's meeting with the Tacoma Police Department personnel on July 17, 1984, he requested from Tacoma Police Department that he be furnished with two guns. Mr. Harris told the Police he feared for his life, and complained

that on the night of the homicide he had two guns stolen from his vehicle.

31. Some time after the homicide and after the Police had met and received an initial statement from Mr. Harris, Mr. Harris appeared at the police station almost on a daily basis talking about the killings.

32. On one occasion, Mr. Harris brought three bullets to the police station and told Sgt. Parkhurst how the gun was used in the homicide.

33. Mr. Harris also asked the police officers to bring Ray Meeks to their office because Mr. Harris wanted to talk to him.

34. The Tacoma Police Department's records contain information on Mr. Harris's conversation with them on July 2, 1984. The observation of the reporting officers in that record was that:

It was very hard to follow Ben Harris's line of thinking as he would jump from one person to another and talking about contracts on this person and that person and talking about someone out to get him and appear that Harris's is very paranoid about his vehicle being vandalized, transmission lines being out, radiator hoses being out, etc. and also his father's vehicle being vandalized.

35. Mr. Harris wrote numerous letters to the Tacoma Police Department concerning his knowledge of the crime.

36. Mr. Harris continued to correspond with the Tacoma Police Department during the time that he was represented by Mr. Anderson. The Tacoma Police Department provided copies of Mr. Harris's letters to defense counsel as well as to the prosecuting attorney. Copies of these letters were received by Mr. Anderson during the course of his representation and prior to the time of trial.

37. In some of these letters, Mr. Harris describes his belief that the family conspiracy resulted in the charges being filed and his being prosecuted for aggravated murder.

38. The letters to the Tacoma Police Department contain allegations against police officers and other named individuals all of whom Mr. Harris alleges were part of a conspiracy. The conspiracy involved members of a Cuban conspiracy, the Ku Klux Klan, the Mafia, and others.

39. Included in the information provided to the Tacoma Police Department was information regarding someone shooting at Mr. Harris's step-father, Abel Lawrence.

40. Mr. Harris denied in his letters that he had anything to do with an attempt to murder his step-father.

41. Other allegations in Mr. Harris's letters concern the probate of the will, Mr. Harris's concerns regarding his receipt of his fair share of the inheritance, and claims that he was charged with the murder only because of the family's concern regarding the inheritance.

42. Mr. Harris alleged prior to the date of the trial that his mother had prepared a will and had left his two brothers $1 each and that Mr. Anderson had information concerning that fact.

43. He also alleged in these letters to the Tacoma Police Department that unless an investigation was conducted regarding the conspiracy among his family members an additional homicide would be committed by them.

44. He alleged that his mother had never advised his step-father of the existence of the will and further advised that his belief that the will was in a safe deposit box.

45. Mr. Harris advised the Tacoma Police Department that he believed Mr. Anderson was pursuing the issue of the existence of the will in the context of his representation of the estate of Bessie Robinson Lawrence.

46. Mr. Harris further advised the Tacoma Police Department that he believed his family had been attempting to have him committed for some time and that they had prepared pleadings to have him sent to Western State Hospital. Mr. Harris indicated that he believed his step-father, Abel Lawrence, was one of the people that was involved in attempting to have him committed.

47. Additional allegations contained in this correspondence received by the Tacoma Police Department prior to trial included

claims that Abel Lawrence had made off with his mother's will.

48. Additional allegations involved claims that his half-brothers had tried to kill their own father, by dropping a car that their father was working on on him.

49. The information in paragraphs 27 through 48 was in records provided to Mr. Anderson.

50. The Defense made no effort to locate educational and medical records for Mr. Harris.

51. Tacoma Public School records for Mr. Harris exist and were available to Mr. Anderson in 1984. The records include requests by school officials for psychological testing of Mr. Harris. The records further reveal that in the opinion of the individuals conducting the testing, Mr. Harris had emotional problems and was eligible for special classes at age nine.

52. The public school records recommended that Mr. Harris's family seek psychiatric services. A public school note of September 6, 1959, indicates Mr. Harris was referred for psychological services. The school records also indicate that Mr. Harris had shot himself in 1957.

53. Records from St. Joseph's Hospital exist and were available to Mr. Anderson in 1984. These records indicate that on December 16, 1957, Mr. Harris was admitted with a gun shot wound to the left chest. Entries in the hospital record indicate that Harris had a contact wound with gun dust visible on the clothing. These records report the opinions of hospital staff that Mr. Harris may have tried to commit suicide.

54. The St. Joseph's medical records further reveal indications of knife wounds on the following dates: May 5, 1964, November 30, 1966 and November 6, 1967. The November 6, 1967, entry indicates that there were three self-inflicted wounds on Mr. Harris's body.

55. Mr. Harris was interviewed by Dr. Harlan McNutt regarding the gun shot wound. There are no psychiatric consultation notes in the hospital file.

56. The letters that Mr. Harris wrote to the Tacoma Police Department in 1984 are not in the Western State Hospital files. Mr. Anderson did not provide to Western State Hospital staff copies of Mr. Harris's letters or the Tacoma school records for their review.

57. The records of Western State Hospital do not contain any information suggesting that they were advised of Mr. Harris's prior suicide attempts.

58. Western State Hospital files do not indicate that the Hospital staff reviewed the Tacoma Public Schools records or knew of the schools' concerns about Benjamin Harris's mental health problems.

59. The Western State Hospital files show that no information was provided by the prosecutor's office about Mr. Harris. The only information furnished regarding the case was in the master file for Gregory Bonds, who Western State had evaluated a week earlier and who had been accused of the same murder.

60. Western State Hospital files state that "Information about Mr. Harris is rather sparse."

61. There is no indication in the Western State Hospital files that they attempted to gain any additional information regarding Mr. Harris either from the Pierce County prosecutor's office or Mr. Anderson.

62. There is no indication in the Western State Hospital files or in Mr. Anderson's files that he volunteered to provide any further information he had regarding Mr. Harris's mental health problems and/or his competency to stand trial.

63. Western State Hospital files show that Mr. Harris advised them that his stepfather had been shot at by one of his brothers.

64. During his stay at Western State Hospital Mr. Harris told Willis Harmala, a social worker, of his concerns that his family was attempting to manipulate him out of his share of his parents' estate.

65. This same information was provided to Donald F. Allison, M.D., a Western State

staff psychiatrist, who reported that Mr. Harris related a:

> ... Paranoid story about everybody in his family after everybody else. Including people shooting at his step-father, people shooting at his car, his brothers and brothers-in-law pointing guns at people to a point that he feels he is somewhat paranoid about this.

66. During his stay at Western State Hospital, Mr. Harris was given an MMPI. He also completed the Rotter Incomplete Sentence Blank and a Rorschach Diagnostic Procedure. The records do not indicate that any of the raw data from these tests were provided to Mr. Anderson or that Mr. Anderson asked for this information.

67. Mr. Anderson's file shows that the only information he received from Western State Hospital was a copy of their diagnostic report, a copy of which was also sent to the court and the prosecuting attorney. Other documents and records from Western State Hospital, including psychological evaluations, interviews, and other reports do not appear to have been requested by or sent to Mr. Anderson. Mr. Anderson did not discuss with the Western State staff for their opinions as to whether the death sentence was appropriate for Mr. Harris.

68. After Mr. Harris was convicted of aggravated murder in the first degree and after the jury returned a verdict finding no mitigating circumstances, Mr. Anderson contacted Western State Hospital and told them he believed his client was a paranoid schizophrenic. He made no such contact prior to the time of trial or the special sentencing hearing.

69. The police reports provided to Mr. Anderson contained the names of approximately 32 witnesses. These included persons who claimed to have overheard Mr. Harris say he was going to kill Mr. Turner or threaten his life, and persons who claimed they heard Mr. Harris contract with Mr. Bonds for the murder of Mr. Turner.

70. Messrs. Haist and Anderson interviewed only Ray Meeks, Annie Sue Bayless,

and Valerie Stevens during the pretrial investigation.

71. Mr. Anderson did not contact or interview Linda Carson, who was Mr. Harris's former wife. If he had, she would have told him of Mr. Harris's preoccupation with the Ku Klux Klan and the Mafia, his belief that her true father was one of the conspirators, and his beliefs that there was a conspiracy to kill him because she was a white person and he, a black person, had married her.

72. Defense counsel never interviewed Althea Harris. Mrs. Harris could have provided defense counsel with information concerning Mr. Harris's attempted suicide in 1957. She would have also told Mr. Anderson that Mr. Harris's family tried to get special assistance for his mental health problems but were unable to find assistance within the community.

73. Althea Harris could have told defense counsel about Mr. Harris's alleged alcohol abuse and how that abuse exacerbated his belief in the conspiracies. Althea Harris would have also told defense counsel about Mr. Harris's beliefs in a conspiracy involving the Klan and the Mafia, and his confused state of thinking before the time of the homicide.

74. Trial counsel did not interview Annie Jones, Mr. Harris's maternal aunt. Had Mr. Anderson interviewed Ms. Jones, he would have learned that Mr. Harris had lacked parental supervision. Annie Jones would have told Mr. Anderson that she had received information concerning the family's desire to keep Mr. Harris locked up so that he could not trouble them and interfere with the distribution of his mother's estate.

75. Mr. Anderson did not interview David Robinson, Sr., Mr. Harris's half-brother. Had Mr. Anderson interviewed Mr. Robinson he would have learned that, in his opinion, Mr. Harris had severe mental problems beginning from the time he was a child. Mr. Robinson believed Mr. Harris had attempted suicide by a gun shot wound in 1957. Mr. Robinson could also have provided information regarding Mr. Harris's preoccupation with conspiracies involving the Ku Klux Klan and the Mafia.

76. Mr. Anderson did not interview Jack Bolton, one of Mr. Harris's former employers. Mr. Bolton would have informed Mr. Anderson that, in his opinion, after Mr. Harris's mother died he became lost, nervous, and "hyper". Bolton was aware that Mr. Harris believed he was a target of schemes and plots involving the KKK.

77. Mr. Anderson did not interview Virginia Wright, who claimed to have overheard Mr. Harris say that he was going to kill Jimmie Lee Turner. Ms. Wright further claimed that she had received information that Mr. Harris had a girlfriend named Claudia Bonner and that Mr. Turner was killed over a motor.

78. Mr. Anderson received information concerning interviews between the Tacoma Police Department and Gregory Bonds's mother. Mrs. Bonds said she had conversations with her son who told her about the homicide. Mrs. Bonds was not interviewed by Mr. Anderson or any of his representatives.

79. Mr. Anderson did not interview L. Ray Scott, who had been a friend of Mr. Harris for 25 years. Mr. Scott was of the opinion that Mr. Harris had serious mental problems and suffered from depression.

80. Mr. Anderson did not interview Doug Shoffner. Had he interviewed Mr. Shoffner he would have learned that Mr. Shoffner believed Mr. Harris suffered from mental health problems prior to the Turner homicide.

81. Mr. Anderson did not interview Leola Taylor, Mr. Harris's maternal aunt. Had he interviewed Mrs. Taylor he would have learned that she believed the gun shot wound in 1957 was a suicide attempt, and that Mr. Harris suffered from depression. Mrs. Taylor would have told Mr. Anderson that she believed Mr. Harris's condition was exacerbated after the death of his mother and that he had an obsession with the Ku Klux Klan and the Mafia.

82. Included in the material provided to Mr. Anderson was an autopsy report done by Dr. Lacsina dated 6/14/84.

83. The police reports provided to Mr. Anderson contained Sgt. Parkhurst's observations of the physical examination of the scene at the time of the discovery of the body of Jimmie Lee Turner.

84. The forensic evidence in this case showed that Jimmie Lee Turner was shot in the neck and in the shoulder.

85. Sgt. Parkhurst believed that only one person could have shot Mr. Turner because of the location and trajectory of the two bullet wounds.

86. On October 22, 1984, two days prior to trial, Mr. Harris gave the prosecution a statement admitting that he was present at the time of the homicide, that Bonds had fired the initial shot, that Bonds had given him the gun, and that he, Mr. Harris, fired the second shot. The transcript of this statement shows that Mr. Harris gave this statement without any concession from the prosecution regarding the pending charge or sentence.

87. Mr. Harris had never advised Mr. Anderson what he would say and the first time Mr. Anderson heard his statement of October 22, 1984, was the same time that the prosecution heard it.

88. The trial records show that Mr. Anderson did not object to the admissibility of Mr. Harris's statement of October 22, 1984.

89. The trial records show that Mr. Anderson did not object to the prosecutor's argument regarding Mr. Harris's credibility for having failed to come forth and give a statement prior to October 22, 1984.

90. The trial records show that Mr. Anderson did not object to the transcript of Mr. Harris's October 22, 1984, statement being admitted as an exhibit and going into the jury room for the jury to review during their deliberations.

91. The trial records show that Mr. Anderson did not object to closing arguments made by the prosecuting attorney concerning Mr. Harris's statement of October 22, 1984.

92. Mr. Anderson was absent from the courtroom during a portion of the voir dire proceedings. Voir dire during this period of

time was conducted by Mr. Haist, an attorney who associated with Mr. Anderson. Mr. Anderson did not request a short continuance to accommodate his schedule.

93. The trial record shows that Mr. Anderson did not request any instruction that would have advised the jury that the death penalty should not be imposed solely to enact retribution or in a spirit of vengeance, and did not request any instructions for the special sentencing phase of the trial, other than one instruction based on WPIC 1.04.

94. The trial record shows that the only evidence presented by the prosecution at the sentencing phase of Mr. Harris's aggravated murder trial was the judgment and sentence in the 1969 manslaughter conviction. The trial record shows that Mr. Anderson did not challenge the admissibility of this conviction.

95. The trial records show Mr. Anderson put on no evidence of (a) Mr. Harris's mental health history; (b) his troubled youth; (c) Mr. Harris's close relationship with his mother or her death shortly before the Turner murder; or (d) Mr. Harris's implicating himself in the Turner homicide and his strange contacts with the police.

96. The petition for attorneys fees filed in the trial court discloses that Mr. Anderson had the following contact with Mr. Harris between August 10, 1984, the date of arraignment, and October 22, 1984, the date of the trial: (a) August 13—12 minute interview; (b) October 11—6 minute interview; (c) October 19—90 minute interview.

97. Mr. Anderson's petition for attorneys fees filed in the trial court discloses that he did bill the Court for time spent on investigation until October 16, 1984, a week prior to trial.

98. Mr. Harris is incompetent on this date.

## II. STIPULATED DOCUMENTS

The attached documents (Appendices A–J) may be accepted into evidence by the Court. The parties waive objections as to hearsay. The parties do not waive the right to put on proof, and argue, that the documentary

statements are incorrect. The Respondent further does not stipulate that any of the witnesses would have testified for Mr. Harris at the sentencing phase of his trial.

DATED this 22 day of October, 1993.

/s/ Thornton Wilson

THORNTON WILSON, WSBA # 8619

Attorney for Respondent

/s/ John M. Jones

JOHN M. JONES, WSBA # 16786

Attorney for Respondent

/s/ Paul D. Weisser

PAUL D. WEISSER, WSBA # 17918

Attorney for Respondent

/s/ Allen M. Ressler

ALLEN M. RESSLER, WSBA # 5330

Attorney for Petitioner

### ADDITIONAL STIPULATION OF PARTIES

[Filed Dec. 8, 1993]

The State and Petitioner stipulate that Harris's family members would have testified at the sentencing phase of trial if asked to do so by Murray Anderson. The parties further stipulate that the testimony would have been substantially as set forth in the stipulated facts.

DATED this 7th of December, 1993.

/s/ Allen M. Ressler
Allen M. Ressler, WSBA 5330
Attorney for Petitioner

/s/ Thornton Wilson
Thornton Wilson, WSBA 8619
Attorney for Respondent